Hillsborough-southern judicial district
No. 2001-665

THE STATE OF NEW HAMPSHIRE

v.

STEVEN PELLETIER

Argued: November 6, 2002
Opinion Issued: March 14, 2003

*Philip T. McLaughlin,* attorney general (*Laura E.B. Lombardi,* attorney, on the brief and orally), for the State.

*Richard E. Samdperil,* assistant appellate defender, of Concord, on the brief and orally, for the defendant.

BRODERICK, J. The defendant, Steven Pelletier, appeals his convictions, following a jury trial in the Superior Court (*Hampsey,* J.), on one count of aggravated felonious sexual assault, *see* RSA 632-A:2 (1996) (amended 1997, 1998, 1999), and four counts of felonious sexual assault, *see* RSA 632-A:3 (1996) (amended 1997). We affirm.

The record supports the following facts. The defendant and his former wife, Linda Pelletier, met in 1989 and were married three months later. The victim, Linda's daughter from a previous marriage, lived with them as did their son. Between 1989 and 2000, the defendant sexually assaulted the victim on numerous occasions.

In 2000, a high school classmate of the victim told her that he had been physically abused by a family member and that his mother had been sexually assaulted. Subsequently, over the course of a few days, the victim wrote two notes to the classmate. The first indicated that she was going to share a secret with him about her life; the second revealed that the defendant had sexually assaulted her. The victim also told her classmate that the defendant, after finding a copy of her first note, struck her, causing bruises to her arm and leg.

The classmate subsequently convinced the victim to talk to a school guidance counselor about the abuse she had suffered. She then disclosed the sexual abuse to two guidance counselors, two principals, a police officer and a representative from the division for children, youth and families (DCYF). The defendant was arrested and indicted on thirty-two counts of sexual assault.

By the time of the defendant's trial in 2001, he was no longer married to Linda Pelletier. Prior to trial, the State filed a motion *in limine* to introduce testimony from Linda Pelletier that "the defendant would often have [her] massage his back as a prelude to sex" and that he "often asked [her] for oral sex and liked the standing position." The State contended that "such evidence [was] not prior bad act evidence but corroborative of the defendant's sexual practices and relevant and admissible pursuant to [New Hampshire Rules of Evidence] 401, 402 and 403." The trial court granted the State's motion despite the defendant's objection that such evidence would violate the "Husband and Wife Privilege" under New

Hampshire Rule of Evidence 504 (Rule 504). At trial, Linda Pelletier testified about the referenced sexual acts with the defendant while the victim testified that she had given the defendant back massages, at his request, prior to many of the charged assaults, and that three of the assaults involved oral sex with the defendant standing.

The State also presented testimony from Dr. Lorraine L. Hazard, a board-certified physician in family medicine, who examined the victim following her disclosures of the sexual assaults. At the close of the evidence, the trial court dismissed twenty-seven indictments because they failed to track the language of the statute with regard to the victim's age at the time of the offense. The jury returned guilty verdicts on the remaining five indictments. This appeal followed.

On appeal, the defendant contends that the trial court erred by (1) allowing his former wife to testify about his sexual habits, (2) allowing Dr. Hazard to testify about the ability of the hymen to heal itself, and (3) allowing the victim's classmate to testify about the victim's disclosures of the various sexual assaults and the origin of the bruises on her arm and leg.

I

The defendant argues that intimate sexual acts between a husband and wife are communications intended to be held in confidence and, accordingly, are privileged under Rule 504. Consequently, he contends that it was error to admit his former wife's testimony regarding his sexual practices absent a waiver of the marital privilege.

While the State concedes that the defendant preserved his objection to the admission of Linda Pelletier's testimony on the grounds of marital privilege, it argues that he never asserted that the sexual acts in question "were communicative." Consequently, the State, citing *State v. Wilkinson*, 136 N.H. 170, 177-78 (1992), contends that the defendant is precluded from arguing on appeal that the marital sexual acts were privileged communications. We disagree.

In its order granting the State's motion *in limine* concerning Linda Pelletier's testimony, the trial court cited to *Wilkinson* and observed:

> In determining whether one spouse may testify against another, a court must find a violation of marital confidence before it can exclude a spouse's testimony. To find a violation, *the communication at issue* must be something confided by one to the other, simply and specially as husband or wife, and not what would be *communicated* to any other person under the same circumstances. While not specifically limited to *verbal or written*

*communications*, the privilege is aimed at protecting *communications or confidences* that pass between spouses.

(Emphasis added; brackets, quotations and citations omitted.) It is clear that the trial court considered the intimate sexual acts at issue while mindful of their possible communicative nature. Accordingly, we find that the issue has been properly preserved for our review.

The determination of whether the marital privilege under Rule 504 applies is intensely factual and rests within the sound discretion of the trial court. *See Cook v. Bennett*, 51 N.H. 85, 92 (1871); *Key Bank of Maine v. Latshaw*, 137 N.H. 665, 673 (1993); *cf. State v. Gordon*, 141 N.H. 703, 705 (1997) (attorney-client privilege). Rule 504 states:

Husband and wife are competent witnesses for or against each other in all cases, civil and criminal, except that unless otherwise specifically provided, neither shall be allowed to testify against the other as to any statement, conversation, letter or other communication made to the other or to another person, nor shall either be allowed in any case to testify as to any matter which in the opinion of the Court would lead to a violation of marital confidence.

Consequently, the trial court must find a violation of the marital confidence before it can exclude a spouse's testimony. *Key Bank*, 137 N.H. at 672. To find such a violation, the communication at issue must be something confided by one spouse to the other, as husband and wife, and not what would be communicated to any other person under the same circumstances. *See id.* At issue here is whether the private, lawful, consensual sexual practices between the defendant and his wife were privileged communications, such that their revelation would violate the marital confidence.

It is well recognized that "communications are not limited to written or spoken words"; acts may also qualify. *Hazelwood v. State*, 609 N.E.2d 10, 15 (Ind. Ct. App. 1993) (quotation omitted).

[A]n act is a privileged communication where the act is as much a communication as would be the words describing the act. . . . [A]ny conversation or act performed by the husband which is attributable to the husband-wife relation, i.e., that which might not be spoken or done openly in public as tending to expose personal feelings and relationships or tending to bring embarrassment or discomfiture to the participants if done outside the privacy of the marital relation, is privileged.

*White v. State*, 440 S.E.2d 68, 70 (Ga. Ct. App. 1994) (citation, quotations, brackets and ellipsis omitted); *see Griffith v. Griffith*, 44 N.E. 820, 821-22 (Ill. 1896) (deposition of former wife regarding former husband's sexual acts not admissible under public policy of marital privilege).

In this case, Linda Pelletier's knowledge of the defendant's sexual practices "was acquired by virtue of her voluntary participation [in them], resulting from a reliance by the participants upon the confidential marital relationship." *White*, 440 S.E.2d at 70. The sexual practices identified by the defendant's former wife "necessarily depended upon [her] presence and participation." *See id.* That the defendant may have acted in the same manner with a third person does not waive the marital privilege. *United States v. Bahe*, 128 F.3d 1440, 1443 (10th Cir. 1997), *cert. denied*, 523 U.S. 1033 (1998). We subscribe to the compelling logic and public policy so well articulated in *Bahe*:

> We believe the accepted norm in this country is that intimate sex[ual] acts between [husband and wife] are communication and an important expression of love.... If we limit the marital communications privilege as narrowly as the [State] seeks in the instant case, a spouse could testify to every aspect of the marital sexual relationship. There is something inherently offensive in that idea.

*Id.* at 1444-45.

There are few, if any, relationships more respected and important than marriage and precious little more intimate, confidential and expressive than the private, consensual sexual conduct of a married couple. To parse sexual conduct between a husband and wife to discern where marital communications begin and end would be an intrusive, unseemly, and ultimately futile exercise. Accordingly, we decline to do so. We therefore hold that private, lawful, consensual sexual activity between a husband and wife constitutes privileged communications under Rule 504.

We are mindful, however, as the Tenth Circuit was in *Bahe*, that the marital privilege may, for reasons of public policy, be appropriately limited. As the *Bahe* court observed:

> Child abuse is a horrendous crime. It generally occurs in the home, and is often covered up by the innocence of small children and by threats against disclosure. It would be unconscionable to permit a privilege grounded on promoting communications of trust and love between [husband and wife] to prevent a properly

outraged spouse with knowledge from testifying against the perpetrator of such a crime.

*Id.* at 1446 (citation omitted). We agree and will not cloak the sexual activity between a husband and wife with the marital privilege when, as here, disclosure would provide relevant information concerning the alleged sexual abuse of a child of one of the spouses who is living with them. *Cf.* RSA 161-F:48 (exception to marital privilege in proceedings involving abuse and neglect of the elderly); RSA 546:22 & RSA 546-A:9 (exception to marital privilege in support proceedings). In light of our recognition of this exception, the trial court did not err in finding that Linda Pelletier's testimony would not violate the marital privilege.

## II

The defendant next contends that the trial court erred by allowing Dr. Hazard to testify about the ability of the hymen to heal itself because her opinion (1) had not been properly disclosed by the State, (2) concerned a matter outside her acknowledged area of expertise, and (3) did not rise to a threshold level of reliability. At trial, the State called Dr. Hazard to detail her examination of the victim following her disclosures. Dr. Hazard testified that her examination revealed no evidence of trauma to the victim's genitalia and that her hymen appeared "normal." Dr. Hazard also testified that the hymen has the ability to heal itself like other tissues.

The defendant contends that this testimony was particularly prejudicial because it provided an explanation for how the genitalia of a sixteen-year-old female, who had been sexually assaulted in the manner alleged by the victim, could show no evidence of trauma. Generally, we accord considerable deference to a trial court's evidentiary rulings and will only intervene when they demonstrate an unsustainable exercise of discretion. *See State v. Dahood,* 148 N.H. 723, 725-26 (2002). Unless a party establishes that such a ruling was clearly untenable or unreasonable to the prejudice of his case, it will not be disturbed. *See State v. Jordan,* 148 N.H. 115, 117 (2002).

The defendant first argues that Dr. Hazard's specific opinion concerning the hymen's ability to heal itself had not been disclosed by the State, as required by Superior Court Rule 98(A)(2)(i). This rule states, in pertinent part:

[T]he state shall provide the defendant with ... statements of witnesses; results or reports of physical or mental examinations, scientific tests or experiments, or any other reports or statements of experts, as well as a summary of each expert's qualifications.

Superior Court Rule 98(H) further provides that parties are under a "continuing obligation" to supplement discovery responses as additional materials are generated or if a party learns that previously provided discovery is "incomplete, inaccurate or misleading."

■ The defendant concedes that he did have notice that Dr. Hazard had examined the victim and would testify regarding her findings, that the State had disclosed Dr. Hazard's examination report, that she had been made available for a deposition, and that he had "pre-trial notice that [Dr.] Hazard would testify about female anatomy and that [the victim] had a normal hymen." The record also shows that the State provided the defendant with Dr. Hazard's *curriculum vitae* to summarize her qualifications. During her deposition, Dr. Hazard testified that, in examining a female child some nine or ten years after the child was sexually assaulted in the manner described by the victim, she would "[m]ore than likely" not find any evidence of trauma, as she expected it "would have healed." She further testified that such healing would include "tears" and that the victim's hymen was "intact" with no transections or cuts, disruptions, clefts or irregularities. Consequently, we find no merit in the defendant's claim that "he could not have anticipated that [Dr.] Hazard would offer a medical opinion about the hymen's ability to heal itself." We find no error in the trial court's failure to find a violation of Superior Court Rule 98.

The defendant next argues that Dr. Hazard's opinion concerning the hymen's ability to heal itself involved a matter outside her acknowledged area of expertise. Specifically, he asserts that the State did not show "what knowledge, training or other expertise" Dr. Hazard possessed that "qualified her to opine that the hymen can heal itself" without making "any reference to texts, studies or other authorities on this subject." We disagree.

We will reverse a trial court's determination of expert qualification only when it results from an unsustainable exercise of discretion. *Baker Valley Lumber v. Ingersoll-Rand*, 148 N.H. 609, 612 (2002). At trial, Dr. Hazard testified that she had been a board-certified physician in family medicine since 1987, that she was a member of the American Professional Society for Abused Children, that she belonged to a network of New Hampshire physicians who provide child abuse evaluations, and that she was specifically trained at the Child Protection Center (CPC) in Cedar Rapids, Iowa, to detect child sexual abuse. Further, she testified that she had worked at the CPC in Sioux City, Iowa, for three years, where she examined several hundred children to investigate alleged sexual abuse, and had received ongoing education about child sexual abuse.

While the trial court may rule that a certain subject of inquiry requires that a member of a given profession, as a doctor, . . . be called, usually a specialist in a particular branch within a profession will not be required. Although a medical degree does not automatically qualify a witness to give an opinion on every conceivable medical question, neither does the *lack* of specialization in a particular medical field automatically *dis*qualify a doctor from testifying as an expert in that field. An individual witness's qualifications must be determined on a case-by-case basis, not by application of a *per se* rule of exclusion or inclusion. The trial judge cannot make a determination as to admissibility without investigating the competence the particular proffered expert would bring to bear on the issues. Only then will the judge be able to decide whether the test of [New Hampshire] Rule [of Evidence] 702 — assistance to the trier of fact — has been satisfied.

*Mankoski v. Briley*, 137 N.H. 308, 312-13 (1993) (quotations, brackets, ellipses and citations omitted).

In this case, Dr. Hazard's extensive background as a physician providing medical evaluations to detect and investigate child sexual abuse was sufficient to qualify her to offer an opinion on the hymen's ability to heal itself, despite her lack of specialization in the field of gynecology. *See Baker Valley*, 148 N.H. at 613. The defendant was afforded the opportunity to cross-examine Dr. Hazard regarding the validity of her opinion and the relevance of her experience. We find no unsustainable exercise of discretion in the trial court's decision to allow Dr. Hazard's challenged testimony.

Finally, the defendant argues that Dr. Hazard's opinion testimony "did not rise to the threshold level of reliability to be admissible" under New Hampshire Rule of Evidence 702 (Rule 702) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The trial judge found that Dr. Hazard was qualified to render a reliable opinion "by virtue of her credentials" and that the nature of her opinion testimony did not require a *Daubert* hearing. We agree.

We review a trial court's determination of expert reliability under Rule 702 for an unsustainable exercise of discretion. *Baker Valley*, 148 N.H. at 612. Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We have stated that expert testimony must rise to a threshold level of reliability to be admissible. *Id.* at 613. In *Baker Valley*, we applied the *Daubert* standards concerning the reliability of expert testimony to Rule 702 and observed:

> The proper focus for the trial court [under *Daubert*] is the reliability of the expert's methodology or technique. The trial court functions only as a gatekeeper, ensuring a methodology's reliability before permitting the fact-finder to determine the weight and credibility to be afforded an expert's testimony. Thus, the trial court must decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.

*Id.* at 616 (citations and quotation omitted). We also stated, however:

> We emphasize that our adoption of *Daubert* does not require a trial court to conduct a pre-trial hearing in every case involving disputed expert testimony. The decision to hold such an evidentiary hearing rests within the trial court's sound discretion. In cases where the testimony's reliability is properly taken for granted, or where the information before the court is sufficient to reach a reliability determination, the trial court need not and should not conduct an evidentiary hearing. Pre-trial hearings, thus, should be limited to the less usual or more complex cases where cause for questioning the expert's reliability arises.

*Id.* at 617 (citations and quotations omitted).

Based upon Dr. Hazard's extensive background as a physician providing child abuse evaluations for detecting and investigating child sexual abuse in hundreds of cases, we find no unsustainable exercise of discretion in either the trial court's determination of reliability or its decision not to conduct a *Daubert* hearing.

### III

The defendant next argues that the trial court erred by allowing the victim's classmate to testify about the victim's disclosures of the alleged sexual assaults and the cause of the bruises to her arm and leg. He argues that the testimony about the content of the victim's notes was hearsay and was offered "to prove that [the defendant] was the person who physically and sexually assaulted [her]." He further asserts that the testimony about

the victim's statements as to the cause of her bruises was hearsay "and [was] not solicited for any legitimate purpose."

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial . . . , offered . . . to prove the truth of the matter asserted." N.H. R. Ev. 801(c). Such a statement is not inadmissible, however, when it is offered for purposes other than its truth. *See State v. W.J.T. Enterprises*, 136 N.H. 490, 493 (1992). That determination is an issue of fact for the trial court, *see id.*, and we will not reverse its evidentiary ruling absent an unsustainable exercise of discretion, *State v. Young*, 144 N.H. 477, 482 (1999); *see State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining "unsustainable exercise of discretion" standard).

██ It is clear from the record that the State offered the challenged testimony about the content of the victim's notes to explain how she had disclosed the information to her classmate and why she felt comfortable doing so. It is also clear that the trial court overruled the defendant's objections to the testimony specifically on that basis. As the testimony about the victim's out-of-court statements was not admitted in evidence to prove that the defendant had physically and sexually assaulted her, it was not inadmissible hearsay. We note that the defendant made no request for a limiting instruction. *See W.J.T. Enterprises*, 136 N.H. at 494.

The defendant also objected to the classmate's testimony that the victim told him the defendant had struck her, causing the bruises on her arm and leg. The State countered that the testimony was offered as a "prior consistent statement" and the trial court admitted it as such. In his brief, the defendant contends that it was "unclear from the record why the trial judge admitted [the] out-of-court statements" as prior consistent statements. The State agrees that the trial court "did not clearly state the grounds on which it overruled the defendant's hearsay objection."

The defendant makes two alternative arguments as to why the trial judge erred in admitting the testimony. First, he concedes that a "prior consistent statement may be admissible for the non-substantive use of rehabilitating a witness' credibility," but contends "it should be coupled with an unambiguous limiting instruction by the trial judge to explain to the jury the limited, rehabilitative purpose of the testimony." He argues that the trial court "did not meet its obligation of informing the jury of the hearsay's limited, rehabilitative purpose."

██ We agree that the trial court did not issue a limiting instruction, but the record is clear that the defendant neither asked for such an instruction, nor objected to the trial court's failure to give one. As such, he cannot now complain of error. *State v. Simonds*, 135 N.H. 203, 207 (1991); *see State v. Scovill*, 144 N.H. 409, 413 (1999).

Second, the defendant contends that "when a prior consistent statement is admitted to rebut a charge of recent fabrication as contemplated under Rule 801(d)(1)(B), it is admitted substantively" and the State is "required to make an affirmative showing, and the trial court must make findings, that the statement was made before a motive to fabricate came into being." He argues that the trial judge did not make the requisite findings for such admission.

Although we agree that the trial court failed to make such findings, that failure neither precluded the admission of the testimony, nor does it require reversal. *See Young*, 144 N.H. at 482. We need not decide if the trial court intended to admit the testimony regarding the victim's bruises substantively or not. The State contends that even if admission of the prior consistent statement was error, it was harmless. We agree.

> The State bears the burden of proving that an error is harmless, a burden satisfied by proof beyond a reasonable doubt that the erroneously admitted evidence did not affect the verdict. In deciding whether the State has met its burden, we consider the strength of the alternative evidence presented at trial. We also consider the character of the inadmissible evidence, including whether the evidence was cumulative or inconsequential in relation to the State's evidence.

*State v. Hodgdon*, 143 N.H. 399, 401-02 (1999) (quotation omitted). The disputed testimony consisted of two statements that the victim had told her classmate that her stepfather had caused the bruises on her arm, and a single statement that her stepfather had kicked her, causing the bruise on her leg. The testimony was not "lengthy, comprehensive, or directly linked to a determination of the guilt or innocence of the defendant" on the charges of sexual assault. *State v. Hennessey*, 142 N.H. 149, 159 (1997) (quotations and brackets omitted). In addition, the testimony at issue was cumulative of the victim's previous testimony concerning the cause of her bruising. *See State v. Martin*, 145 N.H. 313, 315 (2000). Further, the State did not refer to the classmate's testimony concerning the victim's bruises in closing argument. *See Hennessey*, 142 N.H. at 159. Accordingly, we are persuaded, beyond a reasonable doubt, that the admission of this testimony at trial did not affect the verdict.

*Affirmed.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.