Rockingham
No. 2003-002

THE STATE OF NEW HAMPSHIRE

v.

ALLEN BELTON

Argued: February 4, 2004<br>Opinion Issued: April 19, 2004

*Peter W. Heed,* attorney general (*Susan P. McGinnis,* assistant attorney general, and *Michael A. Delaney,* senior assistant attorney general, on the brief and orally), for the State.

*Dawnangela Minton,* assistant appellate defender, of Concord, on the brief and orally, for the defendant.

*Allen Belton,* by brief, *pro se.*

DUGGAN, J. The defendant, Allen Belton, appeals his conviction following a jury trial in the Superior Court (*McHugh,* J.) on one count of robbery. *See* RSA 636:1 (1996). We affirm.

The jury could have found the following facts. On the morning of November 14, 2000, a man robbed the First Essex Bank in Salem. The man told the bank employees that he had a gun and would shoot them. The man then fled the bank on foot with over $14,000 and headed toward Methuen, Massachusetts. As he fled, he was observed by several witnesses, including Christine Spignesi, Rocky Arsenault and George Coker.

After receiving information which led him to believe that the defendant might be a suspect, Methuen Police Officer Christopher McCarthy went to the defendant's Methuen home and questioned him about his recent activities. The defendant then consented to a search of his home and the police seized a pair of white sneakers that matched the description of the robber's footwear. The defendant was subsequently arrested and, the following morning, he confessed to robbing the bank.

A jury trial was held in October 2002. Arsenault and Coker both testified that they selected a picture of the defendant from a photo array. On the other hand, Spignesi described the man she saw on the morning of the robbery but told the jury that she was unable to identify the robber in the photo array.

The State also called Melissa Staples, an expert in DNA forensic analysis, to describe the results of a DNA analysis performed on a nylon mask believed to be worn by the defendant when he allegedly robbed the bank. Staples testified that the defendant could not be excluded as a

source of DNA on the nylon mask. The defendant was convicted on one count of robbery.

On appeal, the defendant contends that: (1) the DNA evidence should have been excluded because there was insufficient statistical interpretation to assist the jury; (2) the State's failure to disclose evidence that a witness was unable to identify the defendant in a photo array should have resulted in exclusion of all evidence concerning photographic identifications; and (3) the trial court erred when it allowed the State to introduce statements he made on the day after his arrest because they were fruits of an unlawful detention. We address each argument in turn.

The defendant first argues that the trial court erred when it found that the DNA analysis results were admissible. Specifically, the defendant contends that because "the State presented no interpretive evidence regarding the likelihood of a potential match if the analyzed sample was from more than one DNA source, the trial court erred when it allowed Staples to testify as an expert and offer her interpretation of the laboratory results." We disagree.

Generally, we accord considerable deference to a trial court's evidentiary rulings and will only intervene when they demonstrate an unsustainable exercise of discretion. *State v. Pelletier*, 149 N.H. 243, 249 (2003). Unless a party establishes that such a ruling was clearly untenable or unreasonable to the prejudice of the party's case, it will not be disturbed. *Id.*

At trial, Staples testified that a DNA analysis revealed that the defendant could not be excluded as a source of DNA on the nylon mask. She further testified that the DNA analysis excluded 99.9 percent of the population as a source of DNA on the nylon mask. With regard to how frequently the DNA types found on the mask would occur in a random sample of the population, Staples said that these same DNA types would be found "in the Caucasian population [in] approximately one in 14,000; in the African American population, about one in 26,000; and in the Southwestern Hispanic population, about one in 28,000."

On direct examination, Staples was asked about "weak results" that were identified during the testing process. Staples stated that the "weak results" could be evidence of a mixed sample, meaning that DNA from another person was present. Staples further stated that "weak results" could be indicative of technical flaws in the testing process. Staples explained that she did not interpret the "weak results" because they were below the required threshold level of intensity and, thus, uninterpretable and unreliable.

On cross-examination, Staples said that because she could not determine whether the DNA the lab tested was from a mixed sample, she did not take this possibility into account when she conducted her statistical analysis. Rather, she said that because there was "no indication above the controls of a mixture in this particular case," the DNA sample was treated as a single source.

The defendant objected to the admissibility of the DNA evidence. He argued that because the nylon mask and other items that were later subjected to DNA testing were stored in the same place as items that were taken from his home, there was a possibility that the DNA analysis was conducted on a mixed sample and, therefore, the DNA evidence should be excluded. The trial court rejected the defendant's argument and pointed out that there was "no evidence" that the items taken from the defendant's home were "somehow commingled" with the nylon mask.

■ We agree with the defendant that if the DNA results presented to the jury were based on the analysis of a known mixed sample, the State would be required to explain how the presence of DNA from another individual would affect the statistical analysis. *See, e.g., State v. Garcia,* 3 P.3d 999, 1003-04 (Ariz. Ct. App. 1999) (holding that *Frye* test for admissibility was satisfied because expert used likelihood ratios to explain results of DNA tests conducted on known mixed samples); *State v. Ayers,* 68 P.3d 768, 775 (Mont. 2003) (affirming trial court's admission of expert testimony where expert used likelihood ratios to explain DNA results from a known mixed sample); *People v. Coy,* 620 N.W.2d 888, 895 (Mich. Ct. App. 2000) (holding that admission of evidence that defendant's DNA profile was consistent with DNA profiles from mixed blood samples was plain error warranting reversal because no testimony was provided to explain the statistical significance of a potential match).

■ In this case, however, there was insufficient evidence to support a finding that the DNA sample was from a mixed source. Although Staples testified that "weak results" could indicate the presence of DNA from another person, she further testified that there was "no indication above the controls of a mixture in this particular case." Moreover, the trial court found that there was no evidence that the nylon mask was "somehow commingled" with items that were taken from the defendant's home. Because the evidence presented was insufficient to support a finding that the DNA analysis at issue was conducted on a mixed sample, we find no unsustainable exercise of discretion in the trial court's ruling that the DNA tests were admissible without additional statistical analysis. *See* N.H. R. Ev. 104(a).

The defendant next argues that the State's failure to disclose that one witness could not identify the defendant in a photo array "should have resulted in the exclusion of all evidence concerning photographic identifications." The State, on the other hand, argues that the failure to disclose was inadvertent, the information was not exculpatory and the defendant was not prejudiced by the late disclosure. We agree with the State.

As we set forth above, we generally accord considerable deference to the trial court's evidentiary rulings and will only intervene when they demonstrate an unsustainable exercise of discretion. *Pelletier*, 149 N.H. at 249. The same standard applies to the review of a discovery sanction. *State v. Cromlish*, 146 N.H. 277, 280 (2001). To show an unsustainable exercise of discretion, the defendant must demonstrate that the trial court's decision was clearly unreasonable and that the decision prejudiced his case. *See id.* at 280-81.

> In determining whether evidence should be excluded for a violation of discovery rules, the trial court may consider several factors, including: whether the violating party made a good faith effort to comply or provided a pre-trial warning to minimize surprise; the ability of the court to limit the scope of testimony or evidence to minimize surprise; and the availability of lesser sanctions or procedural curative measures.

*Id.* at 281.

In superior court, within thirty days after the entry of a not guilty plea, the State is required to provide the defendant with copies of all police reports and statements of witnesses. SUPER. CT. R. 98(A)(2)(i). The State is also required to provide the defendant with "[a]ll exculpatory materials." SUPER. CT. R. 98(A)(2)(iv).

Superior Court Rule 98(J) provides the trial court with a non-exclusive list of sanctions that it may impose for a violation of the discovery rules. Under the rule, the trial court may order the party to provide the discovery not previously provided, grant a continuance of the trial, prohibit the party from introducing the undisclosed evidence or assess costs and attorney's fees against the violating party. SUPER. CT. R. 98(J).

Spignesi told the police that on the morning of the robbery, she saw a black man with very dark skin running towards the woods carrying a bag. She looked at a photo array and picked out "one or two" photographs that she thought were similar to the man she saw, but she was unable to identify any particular person. According to the State, no report was

generated that described Spignesi's inability to identify the defendant in the photo array.

Prior to trial, the State provided the defendant with a copy of Spignesi's statement. The State additionally provided the defendant with a copy of a police report, which detailed discussions with other witnesses, but did not refer to a conversation with Spignesi or indicate that she viewed a photo array.

The defendant's investigator tried to contact Spignesi several times but was unable to speak with her until the evening before the trial began. At that time, the defendant first learned that Spignesi was shown a photo array and that she was unable to identify him. At trial, Spignesi described the man she saw on the morning of the robbery but told the jury that she was unable to identify the man in the photo array.

The defendant alleged that the State's failure to disclose Spignesi's inability to identify the defendant in the photo array was a discovery violation and asked the trial court to exclude all evidence concerning photographic identifications. The trial court denied the motion and ruled that a reasonable cure was for the defendant to question Spignesi in front of the jury about her inability to identify the defendant.

Assuming, without deciding, that the State's actions violated the discovery rules, we cannot find that the defendant has met his burden of proving that the trial court's decision to allow the State to introduce evidence of photographic identifications was an unsustainable exercise of discretion.

Under Superior Court Rule 98(J), the trial court could have ordered the State to inform the defendant that Spignesi was unable to identify him in the photo array. This sanction was, however, unavailable to the trial court because the defendant already possessed the previously undisclosed discovery. The defendant did not ask the court for a continuance or to prohibit the introduction of Spignesi's testimony. Instead, the defendant requested the extreme sanction of excluding all testimony concerning photographic identifications. We agree with the trial court that the defendant's request was unreasonable and agree with its decision to impose a lesser sanction. *See Cromlish*, 146 N.H. at 281.

■ Moreover, the defendant has failed to prove that the admission of the evidence prejudiced his case. Spignesi testified that she was unable to identify the defendant in the photo array. Therefore, the alleged exculpatory evidence was presented to the jury. Accordingly, we cannot find that the trial court committed an unsustainable exercise of discretion

when it denied the defendant's request to exclude all evidence concerning photographic identifications.

The defendant next argues that the trial court erred when it allowed the State to introduce statements he made on the day after his arrest because they were fruits of an unlawful detention. *See* U.S. CONST. amends. IV, V, XIV; N.H. CONST. pt. I, arts. 15, 19. We disagree.

█ We first address the defendant's arguments relying upon the New Hampshire Constitution and reference federal cases only to aid in our analysis. *See State v. Fleetwood,* 149 N.H. 396, 402 (2003); *see also State v. Ball,* 124 N.H. 226, 232 (1983). To determine whether statements made by a criminal defendant should be suppressed as fruit of an unlawful arrest, we apply the following test:

> [W]e must determine whether the act of giving the statement was sufficiently a product of the defendant's free will so as to break the causal connection between the illegality and the confession. In making this determination, we consider the following four factors: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct.

*State v. Gotsch,* 143 N.H. 88, 90 (1998) (quotation omitted), *cert. denied,* 525 U.S. 1164 (1999). We apply the *Gotsch* factors in this case to determine whether the statements the defendant made on the day after his arrest should be suppressed as fruits of his unlawful detention.

Less than an hour after the bank robbery, Officer McCarthy arrived at the defendant's home, saw the defendant in the yard and placed him in handcuffs. While the defendant was handcuffed, Officer McCarthy questioned him about his "recent activities." After a second Methuen police officer arrived, the defendant verbally consented to a search of his home and a pair of white sneakers that matched the description of the robber's footwear was seized.

In the meantime, the police officers continued to interrogate the defendant in his yard. When more people arrived on the scene, the defendant agreed to continue speaking with the officers at the station. Although no *Miranda* warnings were given, when they arrived at the Methuen police station, the police officers continued to interrogate the defendant. *See Miranda v. Arizona,* 384 U.S. 436 (1966). The defendant then indicated that he was no longer willing to cooperate and the police

told him that he was free to leave. The defendant left the police station, but was arrested at his home approximately fifteen minutes later.

The next morning, the defendant waived his right to extradition and was transported to the Salem Police Department. After he arrived at the Salem police station, the defendant asked to speak with Detective Sambataro, a Salem detective with whom he had spoken on the previous day. Before speaking with the defendant, Detective Sambataro gave the defendant his *Miranda* warnings and he signed a *Miranda* waiver form. The defendant then confessed to robbing the bank and "accompanied the police on a trip in a police cruiser over the route he took after exiting the bank."

Prior to trial, the defendant moved to suppress: (1) the incriminating statements he made at his home on the morning of the robbery; (2) the white sneakers that were seized from his home; and (3) the incriminating statements he made to Detective Sambataro on the day after the robbery.

The trial court found that Officer McCarthy initially had a legitimate concern for his own safety when he encountered the defendant in his yard and, thus, his decision to handcuff the defendant was reasonable. Officer McCarthy's permissible restraint on the defendant's liberty became unlawful, however, when Officer McCarthy kept the defendant in handcuffs even though other officers arrived on the scene and a pat-down search of the defendant was not conducted. As a result, the trial court found that the statements the defendant made to Officer McCarthy when he was being illegally detained in his yard and the sneakers that were seized from his home were inadmissible as fruits of an illegal detention. Moreover, because the defendant reasonably believed he was in custody as soon as Officer McCarthy placed him in handcuffs and no *Miranda* warnings were given, the trial court ordered all statements made by the defendant on the morning of the robbery suppressed.

With respect to statements made by the defendant on the day after the robbery, the trial court noted that not only did the defendant ask to speak with Detective Sambataro, but also that twenty-four hours had passed since the time of the unlawful detention. The trial court also found that the defendant "made incriminating statements after knowingly, intelligently and voluntarily waiv[ing] his *Miranda* rights." Therefore, the trial court ruled that the statements the defendant made on the day after the robbery were admissible at trial.

The first *Gotsch* factor clearly favors admissibility of the defendant's statements since he was advised of his *Miranda* rights and signed a *Miranda* form prior to speaking with Detective Sambataro. *See Gotsch*, 143 N.H. at 90-91.

With regard to the second factor, the temporal proximity between the illegal detention and the incriminating statements, twenty-four hours passed between the defendant's illegal detention and his statements to Detective Sambataro. We agree with the trial court that this is a significant period of time which reduces the possibility that the defendant's statements were the product of the illegal detention as opposed to his own free will. *See id.* at 91.

As to the third factor, the presence of intervening circumstances, we first note that after the illegal detention, the defendant was released and returned briefly to his home before being formally arrested. Moreover, the defendant sought out a meeting with Officer Sambataro. In the time between his illegal detention and his incriminating statements, the defendant also consulted with an attorney, was arraigned and waived extradition. As we did in *Gotsch,* we conclude that these intervening circumstances are sufficient, in combination with the other factors, to break the causal chain between the defendant's illegal detention and his incriminating statements on the day after the robbery. *See id.*

As to the fourth factor, we conclude that the police conduct in this case did not rise to the level of flagrant or purposeful police behavior that would render the defendant's incriminating statements fruit of the poisonous tree. *See id.* Less than an hour after the bank robbery, Officer McCarthy received a physical description of the bank robber and determined that the defendant matched this description. Officer McCarthy was aware of the defendant's criminal record and his recent release from jail. When Officer McCarthy arrived, the defendant was standing in his yard. Knowing that the man who robbed the bank claimed to be armed, Officer McCarthy immediately handcuffed the defendant. Officer McCarthy then questioned the defendant about his "recent activities," and received evasive responses. Shortly thereafter, the defendant agreed to accompany the police officers to the station. The trial court ruled that Officer McCarthy's initially permissible handcuffing of the defendant became unlawful when more officers arrived on the scene and a pat-down search was not conducted. We conclude that this was not "the kind of willful or purposeful misconduct that the exclusionary rule was fashioned to deter." *Id.* at 91-92 (quotation omitted); *see also, e.g., Brown v. Illinois,* 422 U.S. 590, 605 (1975) (finding willful and purposeful misconduct where police arrested defendant for "investigation" and in a manner designed "to cause surprise, fright, and confusion"). Thus, we conclude that the trial court did not err when it ruled that the statements the defendant made on the day after the robbery were admissible at trial.

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *See Brown*, 422 U.S. at 602; *Gotsch*, 143 N.H. at 90. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

Finally, the defendant has asked us to consider additional issues that he has raised in a *pro se* supplemental brief. In *State v. Thomas*, 150 N.H. 327, 332 (2003), we held that a criminal defendant who is represented by counsel has no State constitutional right to proceed *pro se* on appeal. We also stated, however, that we could exercise our discretion and permit a defendant to file a *pro se* supplemental brief. *Id.* Despite this holding, we did not develop a procedure for defendants to follow in requesting permission to file a *pro se* brief. Our holding in *State v. Porter*, 147 N.H. 497 (2002), complicates this problem. In *Porter*, we held that because the defendant was represented by counsel, the trial court did not commit an unsustainable exercise of discretion when it refused to consider his *pro se* motions. *Id.* at 498.

■ We hold that, in future cases, when a criminal defendant is represented by counsel on appeal, the defendant may file a *pro se* motion with this court requesting permission to file a *pro se* supplemental brief. The motion must set forth the issues the defendant wishes to raise on appeal that are not being raised by appellate counsel and explain why the court should allow the defendant to brief those issues. We will then review the defendant's motion and decide whether the defendant may file a *pro se* brief.

Here, in addition to the brief filed by the appellate defender, the defendant filed a *pro se* brief. Because the procedure that we set forth today was not in place when the defendant filed his *pro se* supplemental brief, we have considered the defendant's brief. We conclude that the issues raised in it have no merit and warrant no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

BRODERICK, C.J., and NADEAU and DALIANIS, JJ., concurred.