Hillsborough-northern judicial district
No. 2012-447

## THE STATE OF NEW HAMPSHIRE

v.

## JESSICA BOTELHO

Argued: October 10, 2013
Opinion Issued: December 24, 2013

*Michael A. Delaney,* attorney general (*Nicholas Cort,* assistant attorney general, on the brief and orally), for the State.

*James B. Reis,* assistant appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Jessica Botelho, appeals her convictions of manslaughter, *see* RSA 630:2, I(b) (2007); negligent homicide, *see* RSA 630:3, I (2007); and reckless conduct, *see* RSA 631:3, I (2007), following a

jury trial in Superior Court (*Garfunkel*, J.). She argues that the trial court erred: (1) by admitting into evidence the name and description of a particular website that she visited while leaving her children unattended in her bathtub; and (2) by excluding certain portions of a recorded police interview. We affirm.

The jury could have found the following facts. On July 13, 2010, the defendant lived in a second-story apartment with her two sons, W.B., who was twelve months old, and T.P., who was two years old. At approximately 4:00 p.m., the defendant ran a bath for the two boys. At some point, she left the children alone in the bathtub with the water "stopped" and approximately two to three inches of water in the bathtub. She then left the apartment and went to an outdoor porch, where she used her laptop computer to connect to the internet. She later told police that T.P. knew how to turn on the bathtub faucet on his own.

The defendant gave conflicting accounts to police and other witnesses about the nature and length of her computer use, but admitted that she "posted [a] blog" on a website named "myfreeimplants.com." The State described the website, which the defendant admitted that she had visited since 2007, as a "social networking website where people can make donations for others to get free breast implants." A forensic examination of the defendant's computer resulted in a report that documented nearly continuous user activity, exclusively at myfreeimplants.com, from 4:20 p.m. to 5:02 p.m. The majority of entries were associated with viewing and writing blog posts on myfreeimplants.com or sending messages on the website. The report documented only when a user entered, or was directed to, a new web address; thus, several gaps existed in user activity during which the user could have been watching videos, reading online content, or composing messages.

After some time, T.P. approached the defendant to tell her that W.B. was "sleeping swimming." The defendant rushed to the bathroom, where she discovered W.B. in the bathtub with the faucet running. The defendant gave conflicting accounts to police about whether W.B. was lying on the bottom of the bathtub or floating. She turned off the faucet, retrieved W.B. from the bathtub, and attempted CPR. Unable to find her telephone, she ran downstairs with W.B. — leaving behind T.P., who had returned to the bathroom — and asked her downstairs neighbors for help. One of the neighbors called 911 at around 5:00 p.m. while the defendant and another neighbor resumed CPR attempts. A neighbor and his friend drove the defendant and W.B. to the emergency room, where they arrived at approximately 5:12 p.m. Meanwhile, two neighbors retrieved T.P. from the bathtub, which was half-full but draining, and found that the bathroom floor was covered with water. A detective later determined that it took approxi-

mately eighteen minutes to fill the bathtub with the faucet at full volume, and approximately six minutes to drain it.

W.B.'s treating physician found that he had sustained irreversible neurological injury and brain damage as a result of oxygen deprivation. The doctor explained that this type of injury typically occurs "starting around seven minutes of low oxygen delivery" following the initial stages of drowning. After a consultation between the doctor, the defendant, and W.B.'s father, W.B. was removed from life support on July 20, resulting in his death. A medical examiner determined that he had died from complications related to a "near drowning."

Prior to trial, the defendant filed a motion *in limine* "to exclude all evidence pertaining to the specific web addresses [she] visited during the days leading up to [the] incident," including myfreeimplants.com. In so doing, she offered to stipulate that no one else had used her computer on July 13. Following two hearings, the trial court determined that "the probative value of such evidence [was] not substantially outweighed by the danger of unfair prejudice" and denied the motion. The court advised that it would ask a question during *voir dire* to determine whether potential jurors "[held] personal views about breast augmentation that would prevent [them] from being impartial." At trial, the court ordered the redaction of specific references to the defendant's correspondence with men on myfreeimplants.com and noted that counsel had agreed to redact two other descriptions of the website that could be construed as sexual in nature.

The court also approved, after two hearings, a motion *in limine* filed by the State to exclude portions of a videotaped police interview of the defendant that the State had offered against her. The parties had agreed to exclude certain portions of the recorded interview on relevance grounds but disputed whether two separate sections, each one amounting to approximately two pages of transcript, should be admitted. In excluding these two disputed sections, the court rejected the defendant's argument that they should be admitted under the doctrine of completeness. *See* N.H. R. Ev. 106.

At trial, the State mentioned myfreeimplants.com by name twice in its opening statement and six times in its closing argument. Additionally, the State elicited more than forty direct references to the website during its direct examination of a computer forensic expert, who testified about the defendant's web browsing history before and at the time of W.B.'s near drowning. An exhibit detailing this history was comprised largely of web addresses associated with myfreeimplants.com. Finally, there were several references to the website in the redacted video of the defendant's police interview.

A jury found the defendant guilty of manslaughter, negligent homicide, and reckless conduct. On the manslaughter charge, the court sentenced the defendant to the New Hampshire State Prison for five to ten years, stand committed. On the reckless conduct charge, the court sentenced the defendant to a concurrent term of one to three years. The court held sentencing in abeyance on the negligent homicide charge, an alternative theory to manslaughter for W.B.'s death, pending appeal. This appeal followed.

## I. Admission of Website Information

The defendant argues on appeal that the trial court erred by admitting evidence relating to myfreeimplants.com. She argues that the website's identifying information should have been excluded because: (1) it was not relevant; and (2) if it was relevant, any "probative value [was] substantially outweighed by the danger of unfair prejudice." N.H. R. Ev. 403.

■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401; *State v. Jenot*, 158 N.H. 181, 185 (2008). Evidence that is not relevant is inadmissible. N.H. R. Ev. 402; *State v. Mitchell*, 148 N.H. 293, 295 (2002). Even when evidence is relevant, the trial court may exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice." N.H. R. Ev. 403; *Jenot*, 158 N.H. at 185.

> Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case. Unfair prejudice is not, of course, mere detriment to the objecting party's case, in which sense all evidence offered is meant to be prejudicial. Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision on some improper basis, commonly one that is emotionally charged.

*Jenot*, 158 N.H. at 185 (quotation, brackets, and ellipses omitted).

The defendant first argues that evidence relating to myfreeimplants.com was not relevant. She argues that the website's identifying information was not relevant to establishing her interest in the site because the "distinguishing characteristic" of her admissions regarding her use of the site "was how frequently [she] visited the website, not [its] name, content, or

purpose." In addition, she argues that the "specific website features" of myfreeimplants.com, including written and video content and an "interactive component," are "not exceptional." Thus, her argument implies, a generic reference to a website with similar features would have been equally explanatory of gaps in user activity. Finally, she argues that the website's identifying information was not relevant because "forensic analysis and [her] own statements . . . establish[ed] that she had used her computer during the relevant period of time," and because she had offered to stipulate that no one else had used her computer during that time.

Even if the website information was relevant, the defendant argues, any probative value was substantially outweighed by the danger of unfair prejudice. She argues that the State's repeated references to myfreeimplants.com created a risk that jurors would form negative "moral conclusions" about her that had "no bearing on a fair assessment of whether she acted recklessly or negligently." In particular, she argues that jurors were "invited" to conclude that she solicited money "to advance a selfish interest" in breast augmentation surgery that presumably was "non-essential [and] sexually-oriented." References to the website, she argues, "did not just place jurors in a position to judge [her] degree of inattention; [they] invited jurors to conclude that [she] was narcissistic and to judge her, in part, on that basis."

██ ██ Under the unique circumstances of this case, we need not determine whether admission of the website information was error under New Hampshire Rules of Evidence 401 and 403, because even if it was erroneous, the error was harmless. *See State v. Enderson,*148 N.H. 252, 255 (2002). The State has the burden of proving harmless error, which it must do by establishing beyond a reasonable doubt that the erroneously admitted evidence did not affect the verdict. *See State v. Pelletier,* 149 N.H. 243, 254 (2003).

> The evaluation of whether this standard has been achieved involves consideration of the alternative evidence presented at trial and of the character of the inadmissible evidence itself. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt.

*State v. Vandebogart,* 139 N.H. 145, 157-58 (1994) (quotations and citations omitted).

The defendant was convicted of manslaughter, *see* RSA 630:2, I(b); negligent homicide, *see* RSA 630:3, I; and reckless conduct, *see* RSA 631:3,

I. To convict the defendant of the applicable variant of manslaughter, the State had to prove beyond a reasonable doubt that she recklessly caused the death of another. RSA 630:2, I(b). Proof of the applicable variant of negligent homicide required the State to show that she negligently caused the death of another, RSA 630:3, I, though demonstrating that she recklessly caused such death was sufficient, *see* RSA 626:2, III (2007). Finally, proof of reckless conduct required the State to show that she recklessly engaged in conduct that placed or may have placed another in danger of serious bodily injury. RSA 631:3, I. A person acts "recklessly" when "[she] is aware of and consciously disregards a substantial and unjustifiable risk," and the risk is "of such a nature and degree that, considering the circumstances known to [her], its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation." RSA 626:2, II(c) (2007); *see State v. Belonga*, 163 N.H. 343, 362 (2012).

■ Here, the alternative evidence of the defendant's guilt was overwhelming. *See Enderson*, 148 N.H. at 255. Setting aside the names and descriptions of the particular websites that she visited, unchallenged forensic evidence demonstrated nearly continuous online activity from 4:20 p.m. to 5:02 p.m. Although she gave conflicting accounts about the nature and length of her computer use, the defendant admitted in a recorded police interview that she used her computer, located on her porch, to "post[ ] [a] blog" while her young children remained unattended in a bathtub containing water. The risk that her children would drown or suffer serious injury in this situation was "substantial and unjustifiable." RSA 626:2, II(c); *see Belonga*, 163 N.H. at 362.

The defendant's conflicting, and self-serving, statements about the amount of time she spent on the computer do not diminish the overwhelming nature of the evidence that she left her children unattended for an extended period of time. In addition to the computer forensic evidence, the water level in the bathtub before and after W.B.'s near drowning was strong circumstantial evidence that W.B. and T.P. spent an extended period of time there alone. The defendant stated that the water was "stopped" when she left the bathroom, and that, upon her return, she turned off the faucet when she found the water running. Two neighbors testified that, by the time they retrieved T.P. from the bathtub several minutes later, the bathtub was draining but was still half-full, and the floor was wet. The evidence suggests that the bathtub overflowed with water either before or shortly after the defendant retrieved W.B. Even if T.P. had turned on the faucet immediately after the defendant left her children alone in the bathtub, and even if T.P. again turned on the faucet immediately after the defendant went down-

stairs with W.B. to get help, the defendant would have had to leave her children unattended for a significant period of time in order for the bathtub to fill up, overflow, and begin to drain.

The evidence showed that the defendant was "aware of and consciously disregard[ed]" the risk to her children. RSA 626:2, II(c); see Belonga, 163 N.H. at 362. As the defendant concedes in her brief, "[t]he parties did not take issue with the proposition that young children should not be left alone in a bathtub." The defendant told police that she limited the water level to two to three inches, indicating that she understood the risk to her children of drowning in the bathtub. Additionally, she admitted to knowing that T.P. could operate the faucet on his own, further increasing the risk. This evidence, combined with the evidence of the extended period of time during which the defendant left her children unattended, established both that she was "aware of and consciously disregard[ed]" this risk, and that her disregard "constitute[d] a gross deviation from the conduct that a law-abiding person would observe in the situation." RSA 626:2, II(c); see Belonga, 163 N.H. at 362.

Finally, the evidence showed that the defendant's reckless conduct "cause[d]" W.B.'s death, RSA 630:2, I(b), :3, I, and placed T.P. "in danger of serious bodily injury," RSA 631:3, I. The medical examiner testified that W.B. died from complications resulting from near drowning, and W.B.'s treating physician testified that W.B.'s injuries evidenced near drowning. The evidence also showed that the defendant placed T.P. "in danger of serious bodily injury," RSA 631:3, I, when she left him in the bathtub with W.B. Moreover, testimony from neighbors and the defendant's own admissions demonstrated that T.P. remained exposed to the risk when the defendant left him alone in the bathroom while seeking help for W.B. in another apartment.

We also conclude that references to myfreeimplants.com throughout the trial were inconsequential in relation to the strength of the evidence of guilt. See Enderson, 148 N.H. at 256. The majority of references to myfreeimplants.com occurred during a computer forensic expert's testimony, which focused on the length and nature of the defendant's computer use during the relevant time period rather than the specific content of the website. We are persuaded that the State's choice to establish the defendant's computer use with specific references to myfreeimplants.com, rather than generic references to an unnamed website, had no effect on the verdict. See Pelletier, 149 N.H. at 254.

Furthermore, evidence relating to myfreeimplants.com was limited to web addresses and short descriptions, and the trial court excluded potentially salacious content such as references to men with whom the defendant corresponded regarding breast implants. Although the State referred to

the website by name six times in its closing argument, creating a risk of unfair prejudice, its name and description were not directly linked to establishing the defendant's guilt. *Compare State v. Thibedau*, 142 N.H. 325, 330 (1997) (harmless error where the State referenced the disputed evidence in a "small portion" of its closing argument and the evidence was not "lengthy, comprehensive, or directly linked to a determination of the guilt or innocence of the defendant" (quotation omitted)), *and State v. Hennessey*, 142 N.H. 149, 159 (1997) (harmless error where the State did not "call particular attention to [the disputed evidence] in closing argument"), *abrogated on other grounds by State v. Ramos*, 149 N.H. 118 (2003), *and State v. Quintero*, 162 N.H. 526 (2011), *with State v. Pelkey*, 145 N.H. 133, 137-38 (2000) (error not harmless when "[t]he State specifically addressed [the disputed evidence] in its closing argument, *reinforcing its significant prejudicial impact*" (emphasis added)). Instead, specific references to the website in the State's closing argument — which the State made while explaining gaps in user activity — emphasized the website's "interactive" and "social networking" features, and the defendant's interest in the site, rather than its content. As we have noted, the defendant's guilt rested upon the length of her computer use, not the particular websites she visited.

Given the strength of the State's alternative evidence, the relatively inconsequential nature of the disputed evidence, and the manner in which the State used the disputed evidence, we are persuaded, beyond a reasonable doubt, that evidence relating to myfreeimplants.com did not affect the verdict. *See Thibedau*, 142 N.H. at 330. Thus, if error existed, it was harmless. *See id.*

## II. Exclusion of Police Interview

The defendant next argues that the trial court erred by excluding certain portions of her police interview. Specifically, she argues that she should have been able to introduce, under the doctrine of completeness, two sections of the interview that the State removed when it offered a redacted form of the interview as an admission by a party-opponent. *See* N.H. R. Ev. 801(d)(2)(A). We accord the trial court considerable discretion in its decision to admit or exclude evidence and thus will not disturb its decision absent an unsustainable exercise of discretion. *See State v. Warren*, 143 N.H. 633, 636 (1999). In order to prevail under this standard, the defendant has the burden of demonstrating that the trial court's ruling was clearly untenable or unreasonable to the prejudice of her case. *See id.*

██ The doctrine of completeness is a common law rule recognized by this court under which

> a party has the right to introduce the remainder of a writing, statement, correspondence, former testimony or conversation that his or her opponent introduced so far as it relates to the same subject matter and hence tends to explain or shed light on the meaning of the part already received.

*Warren*, 143 N.H. at 636 (quotation and brackets omitted). The rule seeks "to prevent a selective and out-of-context presentation of evidence from misleading the trier of fact." *Id.* "While the rule does not render evidence automatically admissible, otherwise inadmissible evidence may be admitted to prevent a party from gaining a misleading advantage." *Id.* (citation omitted).

■ The common law rule is partially codified by New Hampshire Rule of Evidence 106, which expressly applies to writings and recorded statements. *See id.* at 636-37; *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171-72 (1988) (noting that the corresponding federal rule "partially codified the doctrine of completeness" and that the doctrine "underlies" the rule). Rule 106 states: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time the introduction of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." N.H. R. Ev. 106. Rule 106 permits the introduction of the remaining parts of a recorded statement "in order to prevent the misleading impression given by an out-of-context presentation from taking root." *State v. Keith*, 136 N.H. 572, 574 (1992) (quotation omitted). "The trial court has discretion under Rule 106 to determine whether 'fairness' requires admission of remaining parts or related documents." *Id.*

Here, the police interview was a "recorded statement," and thus the defendant's effort to introduce "any other part" of the statement falls under Rule 106. The redacted interview offered by the State constituted an admission by a party-opponent under New Hampshire Rule of Evidence 801(d)(2)(A). Under Rule 801(d)(2)(A), "a party's own statements are not hearsay when offered against that party regardless of whether or not those statements give rise to a reasonable inference of guilt." *Belonga*, 163 N.H. at 358. Thus, the redacted interview was not subject to the hearsay rule, which generally prohibits the introduction of out-of-court statements in order "to prove the truth of the matter asserted." N.H. R. Ev. 801(c).

By contrast, the excluded portions of the interview that the defendant sought to introduce were not admissible as non-hearsay because these statements were offered *by* the defendant rather than *against* her. *See United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (describing identical federal rule of evidence). Nevertheless, the defendant argues that the trial

court should have admitted these statements under the doctrine of completeness. We address each disputed section in turn.

## A. First Disputed Section

The defendant argues that the first disputed section of the interview should have been admitted because it "emphasize[s] her conviction as to the correctness of her perception of [the amount of] time" she spent on her computer. None of the defendant's statements in this two-page section of the interview transcript make reference to her perception of time. Nevertheless, the defendant suggests that her "sentiments" conveyed in the section — consisting primarily of her insistence that she was "not a bad mom" and her apparent mourning over W.B.'s death — bolster earlier, admitted statements contending that she "wasn't out there that long" and expressing doubt over evidence that she had spent an extended period of time on the computer. The "emotional response" she displays while making these excluded statements, she argues, lends further "credence to her convictions." More broadly, she argues that "[b]ecause the excised portion conflict[s] with the portion that was presented to the jury, in fairness it should have been admitted to explain her other statements."

The trial court did not err in excluding this section. It noted that, over the course of the nearly two-hour interview, the defendant made multiple "emotional" responses, including "periods of crying and near hysterics." Moreover, on several occasions she used the phrase, "my poor boy," apparently mourning W.B., which phrase was also contained in the disputed section. In fact, she used this same phrase several seconds earlier in the admitted portion of the interview, immediately following her expression of doubts over the timeframe. Admission of an additional, identical utterance in order to show the defendant's "emotional response" at this juncture of the interview neither "explain[s] [nor] shed[s] light on the meaning of the part already received." *Warren*, 143 N.H. at 636 (quotation omitted).

In addition, the defendant's statements about her qualities as a mother do not serve to prevent a "misleading impression" regarding the amount of time she admitted to spending on the computer. *Keith*, 136 N.H. at 574 (quotation omitted). The doctrine of completeness seeks to correct "selective and out-of-context presentation[s] of evidence," *Warren*, 143 N.H. at 636, not to supplement particular statements that the declarant wishes to qualify with later displays of "conviction."

Finally, admission of the first disputed section is not compelled, as the defendant argues, merely because it "conflict[s]" with other portions of the interview. Over the course of the interview, the defendant gave multiple explanations regarding her time spent on the computer, ranging from

assertions that she spent only a short amount of time, to expressions of confusion and disbelief, to an acknowledgment that she made a "mistake" and may have spent more time on the computer than she initially thought. These responses are already in conflict. Admitting the first disputed section, which offers no direct response to the question of how long the defendant spent on the computer, would not have "prevent[ed] [a] misleading impression . . . from taking root." *Keith*, 136 N.H. at 574 (quotation omitted).

### B. Second Disputed Section

The defendant also argues that a second disputed section, which contains both an insistence that she "didn't do this" and an "emphatic narrative regarding her concern for T.P.," her surviving child, should have been admitted under the doctrine of completeness. The defendant argues that this section, comprising under two pages of the interview transcript, reflects her "exasperation with the detective who continued to disagree with her recollection of how long she had been on the computer." Because these statements were excluded while other "inculpatory" statements were admitted, the defendant argues, the jury was "shielded from the true content of her statement."

The trial court did not err in excluding this section. Again, the defendant misconstrues statements about her concern for her children — here, her surviving son — as bulwarks against "misleading impression[s]" throughout the redacted interview. *Keith*, 136 N.H. at 574 (quotation omitted). There is no plausible link between the defendant's concern for T.P. following W.B.'s near drowning and her perception of time spent on the computer during the incident. In any event, the defendant expresses her concern for both children throughout the admitted portion of the interview. Thus, jurors would not have been left with a "misleading impression" about the incident absent the defendant's particular expressions of concern in the disputed sections. *Id.* (quotation omitted). As with the first disputed section, statements in the second disputed section that purportedly bolster the defendant's statements as to the time frame were not necessary "to prevent [a] misleading impression . . . from taking root," *id.* (quotation omitted), because the admitted portion of the interview contained a variety of statements expressing her views.

Next, the defendant argues that excluding both disputed sections "prevented" what would have been "a counterbalance" to the prejudice caused by admitting evidence relating to myfreeimplants.com. She argues that the concern she displayed for her children in both sections would have counteracted the impression, created by her use of the website while leaving her children unattended, that she was a "shallow, unconcerned

parent." In addition, she argues that by excluding these sections, the court created "gaps in the conversation" during which "the jury would expect a response from an innocent person."

The exclusion of both sections did not prejudice the defendant because she expressed concern for her children at several other points throughout the admitted portion of the interview. In addition, we disagree with the defendant's characterization of the disputed sections as places at which "the jury would expect a response from an innocent person." The disputed sections do not follow direct questions about the defendant's guilt, and thus the redaction of her responses did not create a misimpression of guilt.

Thus, we conclude that the court's exclusion of the two disputed sections of the police interview was neither clearly untenable nor unreasonable to the prejudice of the defendant's case. *See Warren*, 143 N.H. at 636.

*Affirmed.*

DALIANIS, C.J., and CONBOY, LYNN and BASSETT, JJ., concurred.