Hillsborough-southern judicial district
No. 2010-321

## THE STATE OF NEW HAMPSHIRE

v.

## IVONNE HERNANDEZ

Argued: September 15, 2011
Opinion Issued: November 22, 2011

*Michael A. Delaney*, attorney general (*Diana E. Fenton*, assistant attorney general, on the brief, and *Susan G. Morell*, senior assistant attorney general, orally), for the State.

*Pamela E. Phelan*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Ivonne Hernandez, was convicted by a jury of one count of second degree murder, RSA 630:1-b, I(a), (b) (2007), two counts of second degree assault, RSA 631:2, I(b), (c) (2007), and one count of reckless conduct, RSA 631:3 (2007). On appeal, the defendant argues that the Trial Court (*Lynn*, C.J.) erred by denying her motion to suppress statements she made to the police and by finding one of the State's witnesses competent to testify. We affirm.

Viewing the evidence in the light most favorable to the State, the record supports the following. On the evening of May 1, 2008, Ivonne Hernandez parked her car in the City Hall parking lot in Nashua. She then walked to a nearby bar where she drank four beers and spent several hours watching Karaoke. Meanwhile, Matthew Beaudoin, Robert Goodspeed, Brooke Garger, and Mariah Hughes were at a different bar near City Hall, drinking and socializing.

Around 1:00 a.m., Beaudoin, Garger, Goodspeed and Hughes left the bar and gathered in the City Hall Parking lot. They stood in the parking lot near Hernandez's car, talking and laughing. While they were talking, Hernandez left the bar and walked to her car in the City Hall parking lot. As Hernandez approached her car, she saw the group. One of the State's witnesses testified that Hernandez started yelling at them, saying things like "f— you." Garger yelled back, and there was testimony at trial that Hernandez then slapped Garger in the face. At some point, the rest of the group also began yelling and swearing at Hernandez and ridiculing her for a New York Yankees decal she had on her car.

After this exchange, Hernandez got into her car, started it and backed out of the parking space. One witness testified that as Hernandez was driving away, the group continued to yell at her and Beaudoin banged on her car with his hand. Hernandez left the parking lot, drove across Elm Street and entered a narrow dirt parking lot. As the group left the City Hall parking lot and began walking home, Hernandez turned her car around and drove directly towards the group. At trial, one witness testified that Hernandez then revved her engine and accelerated towards the group. Hughes attempted to jump out of the way, but the car hit her knee, causing

a minor injury. The car also struck Beaudoin and then crashed into a parking meter. Beaudoin was severely injured, and died later that morning at 10:30.

After the crash, Hernandez immediately called 911 and then got out and kneeled by the front of her car. The police arrived at the scene within minutes. Hernandez was visibly distraught, crying and apologizing. She was also bleeding from a laceration to her nose caused by her face striking the steering wheel. She was taken to the hospital for treatment. At approximately 6:30 a.m., Hernandez was taken from the hospital to the police station where she was booked and placed in a holding cell.

At around 11:00 a.m., Detectives Molinari and Testaverde escorted Hernandez from the holding cell to a room for an interview. The detectives explained that the interview would be audio and video recorded. Hernandez was allowed to bring a blanket with her to the interview and the detectives gave her breakfast bars, juice boxes and cigarettes. The interview lasted approximately two hours.

At the beginning of the interview, Hernandez informed the detectives that she could read and understand English; that she had obtained her GED; that on the day of the incident she had smoked marijuana; and that she had drunk four beers that night. Testaverde then explained her *Miranda* rights. As he was explaining these rights, Hernandez asked whether the detectives would "go against her." In response, Testaverde told Hernandez, "Last night you were charged um, with a crime . . . . Anything you say, OK, can be used against you in court . . . we write all our reports up, and, and we just present it . . . and say here's what happened." Testaverde then finished reviewing her *Miranda* rights and Hernandez signed a waiver of her rights.

Shortly thereafter, Hernandez inquired whether Beaudoin "[was] OK." By this point, Beaudoin had already been pronounced dead, but Testaverde replied, "He's getting some treatment . . . . We hope that he's gonna be OK." At trial, Testaverde testified that although he did downplay the extent of Beaudoin's injuries, he had not been aware that the victim was dead. Molinari testified that during interviews, he generally employs minimization techniques. He also stated that this interview was not at all confrontational, and that it was actually "friendly."

During the remainder of the interview, Hernandez described the altercation that occurred in the parking lot. She told the detectives that after she got into her car and drove to the dirt parking lot, she was scared. Throughout the interview, Hernandez claimed that she turned her car around only because she wanted to go home, that the incident was an accident, and that she didn't want to hit anyone. However, when Detective Testaverde said, "You turn around, you're gonna say . . . you think you're

a good Red Sox fan . . . I'm a better Yankee's fan. And I'm going to say screw you. Is that what we're talking about here?" Hernandez responded, "Ya."

About fifty-six minutes into the interview, the following exchange occurred:

DETECTIVE TESTAVERDE: [H]ow close did you want to come to [Beaudoin]?

HERNANDEZ: Not. . . pff. . .

DETECTIVE TESTAVERDE: Not close?

HERNANDEZ: No. No.

DETECTIVE TESTAVERDE: Between you and me, and [Detective Molinari], OK, the three of us in this room, OK, inside, inside your heart . . . did you want to run that [sic] over?

HERNANDEZ: No. No. God no.

Hernandez then continued to explain that the incident was an accident and that she did not want to hit anyone. However, a few minutes later, Hernandez told Testaverde that witnesses would think she wanted to run Beaudoin over. Testaverde then asked, "Ivonne, for that split second, wasn't that true?" and she replied, "Ya." A few minutes after that, Testaverde inquired how she felt when she was driving toward the group. He asked, "[W]hen you get that sight on these people and you gun it, and you start going, you get that feeling, F-U. Am I wrong?" Hernandez responded, "No you're not."

Before trial, the defendant moved to have these inculpatory statements suppressed. The trial judge denied the motion.

I

On appeal, the defendant argues that the statements she made during the police interrogation were involuntary and, therefore, their admission violated her right to due process under the New Hampshire and Federal Constitutions. *See* U.S. CONST., amend. XIV; N.H. CONST. pt. I, art. 15. We first review the defendant's arguments under the State Constitution. *State v. Rezk*, 150 N.H. 483, 486 (2004).

Under Part I, Article 15 of the New Hampshire Constitution, for a defendant's statement to be admissible at trial, the State must prove

beyond a reasonable doubt that the statement was voluntary. *State v. Parker*, 160 N.H. 203, 207-08 (2010). Whether a statement is voluntary is a question of fact to be determined by the trial court. *Id.* at 208. We will not reverse the trial court's determination of voluntariness unless the determination is against the manifest weight of the evidence, viewed in the light most favorable to the State. *Id.*

The defendant asserts that her statements should have been suppressed as involuntary based upon two separate grounds. First, she contends the statements were made in reliance upon a promise of confidentiality. Second, she contends that the statements were involuntary based upon the totality of the circumstances. We address each argument separately.

### A

Generally, we determine the voluntariness of a statement in light of the totality of all the surrounding circumstances. *Parker*, 160 N.H. at 208-09. However, the totality of the circumstances test "does not apply to promises of confidentiality." *Id.* at 209. Instead, the rule is that a statement "made in reliance upon a promise of confidentiality is involuntary under the State Constitution." *State v. McDermott*, 131 N.H. 495, 501 (1989).

The defendant argues that Testaverde's statement "[b]etween me and you and [Molinari]. OK, the three of us in this room, OK, inside, inside your heart . . ." constitutes an impermissible promise of confidentiality. The State disagrees, noting that prior to the interrogation, the defendant was informed of her *Miranda* rights, including an express warning that what she said could be used against her in court. Further, the State argues, Testaverde never told the defendant, or implied, that her statements would not be used against her criminally and after using the phrase in question, he "quickly changed his language."

We first addressed the issue of police promises of confidentiality in *State v. McDermott*, where we determined that such a promise renders statements involuntary under the State Constitution. *McDermott*, 131 N.H. at 501. In *McDermott*, federal drug agents repeatedly misled the defendant into believing his statements would remain confidential. *Id.* at 498-99. The defendant was an informant for the federal Drug Enforcement Administration (DEA). *Id.* at 497. When he initially met with DEA agents to discuss becoming an informant, he was reluctant to provide information about himself or his criminal past. *Id.* The agents assured him that they had never seen a cooperating individual prosecuted by the DEA. *Id.* The defendant disclosed most of his criminal past and even admitted to knowing who committed an unsolved homicide, but refused to elaborate on his involvement in the homicide. *Id.* at 497-98.

Later, the defendant had another meeting with a federal DEA agent because he was running out of money. *Id.* at 498. During this meeting, the agent placed a "pile of money" on the table in front of the defendant and insisted on knowing the details of the unsolved homicide. *Id.* at 498-99. The agent then assured the defendant that the information he provided "would not leave the office." *Id.* at 499. The agent explained "that the DEA simply needed the information . . . to avoid surprises" at trial and that the DEA would never obtain cooperation from informants if it prosecuted them based upon information they provided. *Id.* The defendant then confessed his involvement in the homicide. After the defendant confessed, the agent told the defendant his statements would not be used against him in court because he did not receive *Miranda* warnings. *Id.* The defendant proceeded to elaborate on the details of the murder. *Id.*

A few months later, New Hampshire authorities charged the defendant with first degree murder and attempted to use his statements to the DEA agents against him at trial. *See id.* at 496-99. On appeal, we held law enforcement may not use a promise of confidentiality to obtain incriminating information. *Id.* at 501. We determined that under the State Constitution, a promise of confidentiality renders statements made in reliance upon that promise involuntary and inadmissible. *See id.*

In *Parker*, we applied the *McDermott* rule. The defendant in *Parker* was informed that the interview would be recorded and was given *Miranda* warnings before the interview began. *Parker*, 160 N.H. at 205. About two hours into the interview, the detective told the defendant that "[w]hat you tell me and what we deal with in here can stay between me and you." *Id.* at 211 (quotation omitted). The detective then further confirmed the promise of confidentiality by saying to the defendant "what you tell me in here . . . doesn't have to go to [your mother]." *Id.* at 205 (quotation omitted).

When the defendant did not immediately divulge information, the detective encouraged him to confess by implying that the defendant would not be prosecuted. *Id.* at 206. Specifically, the detective told the defendant that he needed to know the truth "before [he could] say hey, you know what? This is a decent guy. He crossed the line once. . . . It's behind him. . . . Get a little counseling and, and it's over." *Id.* The trial court determined "that the detective's statements merely suggested an atmosphere of confidentiality." *Id.* at 210 (quotation omitted). We reversed, finding that the detective's statement constituted an impermissible promise of confidentiality and, as a result, the defendant's statements were involuntary. *Id.*

■ Although the plain meaning of "between me and you" — the phrase uttered by Testaverde during the interrogation — implies that what is said will remain confidential, *id.* at 211, this case differs from *McDermott* and

*Parker.* In this case, the phrase was used only once. Testaverde did not repeatedly reassure Hernandez that her statements would remain confidential, and he did not use any language implying confidentiality at any other point during the interview. Nor did he ever imply or state that Hernandez would not be prosecuted for the crime. Indeed, he made it clear from the beginning that her statements could, and incriminating statements would, be used to prosecute her.

Although the law remains that a statement made in reliance upon a promise of confidentiality is involuntary, Testaverde's statement here was not the kind of impermissible promise of confidentiality that renders statements involuntary under the State Constitution. His statement hinted at confidentiality, but did not explicitly promise it. In *Parker*, the officers promised that all of the defendant's statements "in [the interrogation room]" would "stay between" the defendant and the officers, specifically promised that the defendant's statements would not be revealed to his mother, and later suggested that the defendant would only be required to get "a little counseling." *Parker*, 160 N.H. at 211. In *McDermott*, the officer not only promised that the defendant's statements would not leave the room, but also promised that without *Miranda* warnings, these statements would not be used against the defendant. *McDermott*, 131 N.H. at 499. Here, however, Testaverde used a phrase one time that, at most, implied confidentiality. While we continue to discourage the police from using this type of language, and will continue to examine possible police promises of confidentiality closely, we conclude that in the narrow circumstances of this case, Testaverde's use of the phrase "between you and me" did not rise to the level of such a promise. The trial court properly denied the defendant's motion to suppress.

B

The defendant also argues that her statements were involuntary because in addition to the statement alluding to confidentiality, the totality of the other circumstances surrounding the interview rendered the statements involuntary. Specifically, among other things, the defendant argues that her statements were coerced because she had no prior experience with police, she hit her head on the steering wheel during a serious car accident less than twelve hours before the interrogation, there was no evidence as to whether she had any sleep before the interrogation, and during the interrogation, the police employed minimization and other similar techniques.

"In determining whether a [statement] is voluntary, we look at whether the actions of an individual are the product of an essentially free and unconstrained choice . . . ." *Rezk*, 150 N.H. at 487 (quotation omitted).

A confession is involuntary if it is "the product of a will overborne by police tactics, or of a mind incapable of a conscious choice." *Parker*, 160 N.H. at 208 (quotation omitted). In making a voluntariness determination, the court considers the totality of all surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *Id.*

■ ■ The evidence supports the determination that the defendant's statements to the police were voluntary. At the interview, the defendant was allowed a blanket, and was given food and drink. Although the defendant apparently did not have any prior experience with police, she is of at least average intelligence. While lack of police experience is certainly a factor to be considered, it does not necessarily imply that the defendant cannot make a meaningful choice. *Cf. State v. Damiano*, 124 N.H. 742, 747 (1984) (holding mental illness does not render a confession involuntary as a matter of law). Further, despite the fact that the defendant had been drinking the night before, there was no evidence that she was drunk or significantly impaired at the time of the interview. *Cf. State v. Chapman*, 135 N.H. 390, 401 (1992) (confession voluntary even though defendant was inebriated at the time of confession).

■ The interview itself was "not an inordinate or oppressive length" — it lasted less than two hours. *See Chapman*, 135 N.H. at 401 (finding a two and a half hour interview was not oppressive or inordinate). At the beginning of the interview, Testaverde read and carefully explained the meaning of her *Miranda* rights and obtained a waiver. While compliance with *Miranda* does not conclusively establish that a defendant's subsequent statement was voluntary, it is one of the factors the trial court may consider. *State v. Bilodeau*, 159 N.H. 759, 764 (2010). The detectives never promised the defendant leniency and, as we explained above, the single reference to confidentiality did not taint the entire interrogation. Further, the interrogation was not hostile. *See Chapman*, 135 N.H. at 401. At the end of the interview, even Hernandez agreed that the detectives treated her with respect throughout. *See State v. Hall*, 148 N.H. 671, 673 (2003). Although the detectives admittedly used minimization techniques and were "friendly" to the defendant, the police are not prohibited from misleading a suspect, *id.*, and friendly police conduct does not alter the voluntariness of a defendant's statements. *State v. Hammond*, 144 N.H. 401, 405-06 (1999).

In this case, the evidence supports the conclusion that the defendant's statements were the product of a free and unconstrained choice. Based upon this evidence, we cannot say that the trial court's determination was against the manifest weight of the evidence. Accordingly, we affirm the trial court's finding that the defendant's statements were voluntary.

■ In light of the fact that the State Constitution affords greater protection than does the Federal Constitution, *see Hammond*, 144 N.H. at 404, we reach the same result under the Federal Constitution.

## II

During the initial confrontation in the City Hall parking lot, Colleen Hake, characterized by the parties as a "homeless woman," was sleeping near the steps of City Hall. The State deposed Hake and planned to call her as a witness at trial. Before trial, the defendant moved to exclude Hake's testimony on the grounds that Hake was not competent. The court held a competency hearing at which the trial judge found the witness competent to testify, but allowed that his ruling could be revisited.

In her motion and at the competency hearing, the defendant presented evidence that Hake had mental health issues and delusional beliefs. For example, at the hearing Hake testified that she did not know how many children she had, and that when she was pregnant, her doctor told her she was pregnant with only one child, but when she gave birth, she saw "about six" babies taken out of the delivery room. Hake also testified that she believed her mother was abducted and replaced by an imposter who looked like her real mother.

After the hearing, but before Hake testified at trial, the trial judge conducted a *voir dire* outside the jury's presence to revisit competency. During *voir dire*, Hake testified that she understood that she was under oath and accurately answered questions aimed at determining whether she understood the difference between the truth and a lie. Hake was not further questioned about her mental health problems or her delusional beliefs during *voir dire*. The trial judge again concluded the witness was competent to testify, explaining, "I have no question as to this witness' understanding of her obligation to tell the truth and her ability to do so." On appeal, the defendant argues that the trial court erred when it found Hake competent to testify.

■ When the record contains evidence to support the trial court's determination of competency, we will not overturn that determination absent an unsustainable exercise of discretion. *State v. Mills*, 136 N.H. 46, 49-50 (1992). "[M]uch depends on the trial court's firsthand observations of the witness." *State v. Briere*, 138 N.H. 617, 620 (1994). Because the trial court is in the unique position of being able to directly observe the witness, "its conclusion that the witness is competent is entitled to great deference." *Id.*

■ New Hampshire Rule of Evidence 601 creates a presumption that witnesses are competent. *See* N.H. R. Ev. 601(b). This presumption can be

overcome by findings that the witness "lacks sufficient capacity to observe, remember and narrate as well as understand the duty to tell the truth." *Id.* Implicit in an understanding of the duty to tell the truth is an understanding of the distinction between the truth and a lie. *State v. Horak*, 159 N.H. 576, 579 (2010). The focus of a competency determination is whether the witness possesses such an understanding.

In this case, the trial court held a hearing on the motion to exclude the witness's testimony and later conducted *voir dire* of the witness during the trial. At both the hearing and *voir dire*, the court was able to observe the witness. Although the witness had mental health problems and some delusional beliefs, the presumption of competency is not rebutted merely because a witness may be mentally ill. *State v. Keyes*, 114 N.H. 487, 490-91 (1974) ("[A]lthough at one time an insane person was incompetent to testify, the present rule is that one who is insane . . . may testify if the trial judge finds he [understands the duty to tell the truth]."). The record supports that the witness understood her duty to tell the truth and the trial judge's determination that the witness was competent to testify was not an unsustainable exercise of discretion.

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.