Hillsborough-southern judicial district
No. 2009-129

# THE STATE OF NEW HAMPSHIRE

v.

## NICOLE BELONGA

Argued: October 13, 2011
Opinion Issued: March 16, 2012

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J., retired, specially assigned under RSA 490:3. The defendant, Nicole Belonga, appeals her conviction for manslaughter, *see* RSA 630:2, I(b) (2007), in the death of her infant child. On appeal, she argues that the Superior Court (*Hampsey*, J.) erred in denying her motion to suppress, as involuntary, her statements to police. She also argues that the Superior Court (*Groff*, J.) erred in admitting certain evidence at trial. We affirm.

## I

The main issue on appeal is whether the defendant's statements to police during an interview were voluntary. A portion of the interview was videotaped. We take the following facts from the record and, when indicated, from that videotape.

On Wednesday January 4, 2006, the defendant left work at approximately 2 p.m. to take Rylea Belonga, her twenty-one-month-old daughter, to the doctor because she had not been well. The doctor diagnosed Rylea with acute gastroenteritis and gave the defendant instructions on how to care for her. The following day, Thursday January 5, the defendant stayed home from work to watch Rylea because she was still not well. The defendant's father was at the house periodically during the day, but otherwise the defendant was the only person at home with Rylea. That night, the defendant left Rylea in her mother's care for approximately two hours while the defendant attended a class at a local college.

At approximately 7:50 a.m. the next day, Friday January 6, the defendant left Rylea at Angie Baldwin's house, because Baldwin had agreed to babysit Rylea while the defendant was at work. At approximately 8:20 a.m., Baldwin left her home for a few minutes to buy cigarettes at a nearby store. She left Rylea with her boyfriend, David Kaley, who was living with her at the time. Upon returning from the store, Baldwin discovered Rylea unconscious on the living room floor, with Kaley next to her yelling her name. He told Baldwin that Rylea had vomited, "started shaking," and then collapsed. Baldwin immediately called both the defendant and 911. A few minutes later, police, firefighters and paramedics arrived. The defendant arrived shortly thereafter.

Paramedic Roy Olsen examined Rylea at the scene. He checked her airways, breathing and circulation. He discovered a bruise on Rylea's forehead that extended into her hairline. He determined that Rylea needed immediate medical treatment and transported her in an ambulance, accompanied by the defendant, to Southern New Hampshire Medical Center (SNHMC).

At the hospital, Doctor Miller treated Rylea in the emergency room. He noticed a bruise on her forehead, and that her body was exhibiting signs of a seizure. He ordered a CT scan and, from the results, discovered that her brain was seriously injured — it was bleeding, it had shifted to the right and it was under "excess pressure." Due to the severity of her brain injuries, and the fact that SNHMC does not have a pediatric intensive care unit, Rylea was airlifted to New England Medical Center in Boston at approximately 10:30 a.m.

While Rylea was in the emergency room, the defendant was in the hospital waiting room. At approximately 10:00 a.m., Detectives Douglas

Dunham and Andy Karlis of the Nashua Police Department arrived at the hospital. After gathering some basic information from the defendant, Detective Karlis asked her if she would be willing to go to the Nashua Police Station to give a statement. The defendant responded that she could not go to the station because she had to go to Boston to be with her daughter. Karlis, however, persisted, telling her that the police had to talk to her immediately to determine what had happened and assuring her that the questioning would not take long.

After the third request, the defendant agreed to go. Because her car was at Baldwin's house, Officer Gerard Healy transported her to the police station in a police cruiser. The police testified that, at this time, the defendant was not the main suspect. The defendant testified that, during the ride to the station, Officer Healy told her that Kaley, who was with Rylea when she collapsed, was probably going to be arrested. The record also indicates that, even though the police officers at the hospital were insistent, they were polite and the defendant was "very cooperative."

The defendant arrived at the police station at approximately 11 a.m. Healy signed her in as a guest. He did not pat her down, place her in handcuffs, or take any of her belongings. Healy brought her upstairs to wait for her interview. Healy did not tell her that she was free to leave, nor did he tell her how long the interview would last.

Approximately thirty minutes after the defendant arrived, Detective Patrick Goodridge met with her in a windowless, eight by ten foot interrogation room that contained a table and three chairs. Although the door was closed, it was not locked. This portion of the interview was not recorded.

Goodridge testified that he first had the defendant fill out a victim-witness background sheet, and then asked her some background questions about Rylea, including questions about her medical history and prior medical problems. Goodridge offered the defendant coffee, which she accepted. He testified that at this point in the interview she was pleasant and cordial. After approximately thirty minutes, Goodridge left the interview room to take a break, leaving the defendant alone in the room for approximately twenty minutes. The defendant testified that when Goodridge returned she told him she wanted to go to Boston to see Rylea, but Goodridge said they were not finished.

During this segment of the interview, Goodridge asked the defendant to describe what had happened on the days leading up to Rylea's collapse. According to Goodridge, the defendant said that Rylea had visited a two and one-half year old child who hugs Rylea "really hard" and "would head-butt Rylea," causing her to bruise. Goodridge testified that these

statements concerned him because he has children and had never seen such a young child "cause bruising by hugging or banging a head."

Shortly thereafter, Goodridge took another break, during which he discussed his concerns with another detective. At that point, it was determined that Detective Jeffery Maher would accompany Goodridge and the two of them would continue interviewing the defendant. They resumed the interview at approximately 1:15 p.m.

Goodridge first repeated some of his previous questions, so as to inform Maher of what had already been covered. The defendant testified that she again asked if she could leave and that the detectives either ignored her requests or told her that she could leave after a few more questions. The detectives, however, testified that at this point in the interview she did not ask or try to leave. She was also permitted to use the restroom twice.

Maher proceeded to ask the defendant whether she had ever hit Rylea. According to Maher, "[s]he emphatically stated that she never, ever hit Rylea." He told the defendant that they would be interviewing a number of people and he hoped nobody would say that she had hit Rylea. According to Maher, the defendant then described three separate instances in which she used physical force against Rylea. First, she said that in October or November of 2005 she struck Rylea after Rylea had bitten her. Second, she said that, on the day before Rylea's collapse, Rylea was squirming when she was changing her diaper so she held Rylea down by her chest and her hand may have slipped to Rylea's "neck area." Third, she said that, on the same day, she disciplined Rylea because Rylea had slapped her in the face several times. She explained that she told Rylea to go to "time-out" but that Rylea refused. She then "grabbed" Rylea, placed her on the floor standing, and "pushed her from the back of the neck" towards the corner of the room, where Rylea hit her head on a bookshelf.

After this exchange, at about 3:30 p.m., Maher left the interview room to consult with other detectives. He informed them of what the defendant had said, and was instructed to read the defendant her *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and to videotape the remainder of the interview. Fifteen minutes later, he returned to the interview room and the detectives began videotaping the interview.

At the outset, Maher had the defendant confirm both that she knew she was being recorded and that she had come to the police station voluntarily. As instructed, he also read the defendant her *Miranda* rights; she indicated she understood them and signed a *Miranda* waiver. Then, the detectives again questioned her about the days leading up to Rylea's collapse. She said that: while changing Rylea's diaper she "would push her back down on the floor;" she "had to keep pushing her down on the floor;" and she "had to keep like turning her and getting her to lay back down . . .

cause she was trying real hard to get up." She also said her hand "was on . . . her chest . . . [u]nder her neck [on the collarbone area]." When asked if her hand may have "slipped up a little bit higher [than her collarbone]," she said, "It might have." Additionally, when asked if she may have used "too much force" to push Rylea back down, she said, "I might have."

The defendant also described the incident on the day prior to Rylea's collapse in which she disciplined Rylea for slapping her. She said, "[S]he was sitting on my lap . . . . I took her by her arms and I put her on the floor [standing] and she wanted to come back towards me and I turned her around and I pushed her towards the corner and I was like, no go timeout." Additionally, she said, "[Rylea] was really mad about having to go to timeout so when she walked in timeout, she hit her head on the bookcase." A few minutes later, when asked by the detectives whether she used "a little too much force," she said, "It's quite possible that I put her on the floor a little too hard." In addition, when asked if she may have grabbed the back of Rylea's neck and if she may have used too much force in doing so, she said, "It's possible." The defendant also described the fall 2005 incident in which she "smacked [Rylea] in the mouth" after Rylea had bitten her. Finally, the defendant added that she sometimes has a problem controlling her anger.

Throughout the videotaped portion of the interview the defendant expressed a desire to see her daughter in Boston. In response to this, the detectives told her that they were questioning her in order to help her daughter. Maher said, "[T]he reason we ask these detailed questions is because . . . [w]e went [sic] to help your daughter," and that "the questions that we ask are just to help your daughter . . . [a]nd to help her . . . try to get the care that she needs . . . down in Boston." Goodridge said, "Rylea's condition is critical. . . . It's really hit or miss right now. And that is why it's critical you let us know what occurred."

The detectives did make clear, though, that the defendant was at the police station voluntarily. Near the middle of the interview, Goodridge said, "You know you're here voluntarily" and the defendant responded, "Yes."

The detectives also assured the defendant that they were not threatening to take Rylea from her. At one point the defendant said, "You guys are going to take my kid." In response, Maher asked her whether they had ever threatened to take Rylea, and asked, "Is there anything that we've said, that says, that's it, we're taking the kid?" The defendant answered no to both questions.

Eventually, near the end of the interview, the defendant broke down. The detectives told her that Rylea might die as a result of her injuries, and that she might be arrested. She accused the detectives of lying to her and said, "You told me you were a human and I wasn't [going to] get arrested and

now you're going to try to get me arrested when I should be in Boston with my daughter." Finally, at 5:15 p.m., after six and one-half hours, the defendant left the police station.

In a pre-trial motion, the defendant argued that her statements to the detectives were involuntary and, thus, that the admission of those statements at trial would violate her constitutional rights. After a hearing, the court denied her motion. Her statements were admitted at trial through the videotape and the testimony of the detectives.

## II

On appeal, the defendant argues that her statements were involuntary and that the admission of those statements at trial violated her due process rights under both Part I, Article 15 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution. We first address the defendant's claims under the State Constitution and rely upon federal law only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

■ "Our State Constitution requires the State to prove beyond a reasonable doubt that the defendant's statements were made voluntarily." *State v. Aubuchont*, 147 N.H. 142, 146 (2001). Whether a statement is voluntary is initially a question of fact for the trial court. *Id.* We will not overturn the trial court's voluntariness decision unless it is contrary to the manifest weight of the evidence, viewed in the light most favorable to the State. *Id.*

■ The focus of our voluntariness inquiry is whether the defendant's statements are the product of an essentially free and unconstrained choice, as opposed to the product of a will overborne by police tactics, or of a mind incapable of a conscious choice. *State v. Parker*, 160 N.H. 203, 208 (2010). In making this inquiry, we examine the totality of the circumstances, including "the characteristics of the accused and the details of the interrogation." *State v. Hammond*, 144 N.H. 401, 405 (1999) (quotation omitted).

The defendant first argues that her statements were involuntary because the detectives said that her answers to their questions would help Rylea's medical treatment. These statements, she argues, sought to play on her emotions to "extract a statement" and were misleading. The defendant also argues that the totality of the other circumstances rendered her statements involuntary. She points to her distressed emotional state, the detectives' use of minimization techniques, the detectives' false statements about the state of Rylea's health, her belief that she could not leave the police station and the detectives' failure to inform her otherwise, the fact that she did not eat any food and was not offered any food, her lack of access to a telephone, the

"small confines" of the interview room, the detectives' repetition of questions and the length of the interview.

As to the defendant's first claim, the record demonstrates that the detectives did suggest they were asking questions in order to assist in Rylea's medical treatment. At one point, Maher said, "[T]he reason we ask these detailed questions is because . . . [w]e went [sic] to help your daughter." Goodridge later said, "Rylea's condition is critical. . . . It's really hit or miss right now. And, that's why it's critical you let us know what occurred." Finally, Maher said, "[T]he questions that we ask are just to help your daughter . . . [a]nd to help her . . . try to get the care that she needs . . . down in Boston."

The defendant argues that this tactic rendered her statements involuntary because (1) the detectives' statements exploited her compassion for her daughter and (2) the detectives' statements were misleading. We address each argument in turn.

■ First, under some circumstances a confession may be involuntary because the police unreasonably exploit a person's compassion for a loved one. For example, courts have held that a confession may be involuntary when police make threats to arrest a suspect's family members. *See, e.g., United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993); *State v. Perez*, 920 N.E.2d 104, 118-20 (Ohio 2009); *Osburn v. State*, 326 S.W.3d 771, 790-91 (Ark. 2009); *People v. Weaver*, 29 P.3d 103, 127 (Cal. 2001). Likewise, courts have held that a confession was involuntary when police threatened to separate a suspect's child from the child's family. *See, e.g., United States v. Tingle*, 658 F.2d 1332, 1336-37 (9th Cir. 1981) (holding that a confession was involuntary where "the purpose and objective of the interrogation was to cause [the defendant] to fear that, if she failed to cooperate, she would not see her young child for a long time"); *Hall v. State*, 266 N.E.2d 16, 19 (Ind. 1971) (holding that a confession was involuntary where "police officers stated that [defendant's] wife was a prime suspect in the burglaries along with the [defendant], and there was a clear implication if [defendant] did not confess, [his wife] would be charged, which would necessitate the place[ment] of [defendant's] small children in the custody of others").

The detectives here, however, did not make such threats. Rather, during the interview they merely made three isolated comments about "helping Rylea." *Cf. State v. Hernandez*, 162 N.H. 698, 704-07 (2011) (holding that a confession was voluntary even though interviewing officers implied that the defendant's statement would remain confidential where the officers did not "repeatedly reassure [the defendant] that her statements would remain confidential"). Moreover, it is clear from the record that they did not repeatedly raise the issue of Rylea's medical treatment in an effort to

obtain answers from the defendant. Indeed, they had little reason to do so — the videotape reveals that, with little hesitation, the defendant gave detailed answers to the detectives' questions.

Furthermore, when the detectives did refer to Rylea's medical treatment, they did so in a vague manner. They never said they were communicating the defendant's answers to doctors. Nor did they ever say that Rylea would suffer injury if the defendant did not answer questions. The detectives never even referred to the physicians treating Rylea — they merely mentioned Rylea's medical care in Boston.

Thus, this is not a case in which the police impermissibly used a defendant's compassion for a loved one to "extract a statement." The few non-threatening, vague comments the detectives made about Rylea's medical treatment were innocuous and within the bounds of permissible interrogation tactics.

■ As to her second argument, the defendant is correct that the detectives' statements were misleading in the sense that her answers to the police were not going to help the doctors in Boston treat Rylea. However, "police are not prohibited from misleading a suspect." *Hernandez*, 162 N.H. at 706; *see also State v. Hall*, 148 N.H. 671, 673 (2002) ("Although the officers may have misled the defendant into believing they had incriminating evidence, their comments were not so deceptive as to render the confession involuntary."). Accordingly, we are not persuaded that the detectives' references to Rylea's medical treatment support the defendant's claim that her statements were involuntary.

■ With regard to the other circumstances raised by the defendant, we first address her argument that her emotional state at the time of the interrogation tends to show that her statements were involuntary. Our case law makes clear that, absent overreaching, deception or coercion by the police, a defendant's emotional response to an interview does not render a confession involuntary. *See State v. Carroll*, 138 N.H. 687, 695 (1994); *State v. Chapman*, 135 N.H. 390, 400-01 (1992). Here, as evidenced by the transcript and the videotape of the recorded portion of the interview, the detectives did not take advantage of the defendant's emotional state to coerce a confession. For example, when the defendant expressed her concern that the police were going to take Rylea away from her, the detectives made clear that they were not threatening to take Rylea. And, near the end of the interview, when the defendant became emotionally distraught, the detectives offered her assistance, asking her if she wanted water or needed anything else. Thus, nothing in the record indicates that the detectives impermissibly exploited the defendant's emotional state in a way that overbore her will.

■ The defendant next argues that Maher's minimization of the possible causes of Rylea's injuries affected the voluntariness of her statements. At the suppression hearing, Maher testified that he used an interrogation technique that involves "minimizing the actions [of defendants to suggest] that they are less culpable for their actions, whether it be due to a chemical dependence or being under the influence of alcohol or drugs or being [under] the stress of a single parent." Therefore, this interrogation technique does not entail the use of outright falsehoods, but rather the use of subtle subterfuge. Given that police are permitted to mislead a suspect, they are likewise permitted to use minimization techniques. *See Hernandez,* 162 N.H. at 706.

In a similar vein, the defendant contends that the detectives gave her false information about her daughter's medical condition. The record, however, does not support this claim. The defendant relies on Goodridge's statement that Rylea was "in the best place she can possibly be" and the following statement by Maher:

> [A]s I've explained to you, this injury to your daughter could be something that occurred in a very minor, very accidental way. Or, it could have been, you know, something else entire[ly]. But, all accounts at this point are that it was uh, a, a minor thing.

Neither of these statements relates to Rylea's medical condition. By suggesting that Rylea was accidentally injured, Maher was merely minimizing the *possible causes* of her injuries. And, the statement about Rylea being in "the best place possible" has no relation to her medical condition; it is merely a comment on the reputation of the hospital treating her. Furthermore, the police did accurately update the defendant about her daughter's condition — near the end of the interview Goodridge said, "When we left here, we went out and we got an update from the . . . hospital. Rylea's condition is critical." Therefore, the defendant's claim that the detectives lied to her about Rylea's medical condition is not supported by the record.

Next, the defendant relies upon her subjective belief that she was not free to leave the police station and the detectives' failure to tell her that she was free to leave. The record shows that the defendant repeatedly expressed her desire to leave to see her daughter, but that the detectives ignored her requests, telling her that they had more questions to ask and that they were trying to help her daughter. Importantly, though, the detectives never said she could not leave; nor did they threaten her with any repercussion if she did leave. The defendant also acknowledged that she came to the police station voluntarily and later confirmed that she remained there voluntarily. Thus, the detectives' actions were not coercive — they did

nothing to force the defendant to remain at the police station, they alerted her to the fact that she was at the station voluntarily, and their evasive responses to the defendant's statements about wanting to see Rylea were, at most, a non-coercive technique used to persuade her to stay and complete the interview. Furthermore, our conclusion is supported by the trial court's finding that the defendant was not in custody because "a reasonable person in the defendant's position would have felt free to leave."

■ The defendant also directs us to the fact that during the six and one-half hour interview the defendant did not eat anything and was not offered food, and did not have access to a telephone. Depriving a defendant of adequate food and water is indeed the archetype of impermissible police coercion. *See, e.g., Brooks v. Florida,* 389 U.S. 413, 414-15 (1967); *Reck v. Pate,* 367 U.S. 433, 441 (1961). That is not, though, what occurred here. On at least two occasions, the detectives offered the defendant beverages. Although the defendant correctly observes that the detectives did not offer her food, nothing in the record suggests that they denied her food. Indeed, she did not ask for food during the recorded portion of the interview and she does not argue on appeal that she asked for food at any other point. Absent such a request, under these circumstances the detectives' failure to provide food does not support her claim that her statements were involuntarily given. *Cf. Carroll,* 138 N.H. at 695 (upholding trial court's ruling that a confession was voluntary where, among other things, "there was no evidence that the defendant needed or was deprived of food"). The defendant's claim regarding access to a telephone is likewise unavailing, for nothing in the record suggests either that she asked to use a telephone or that the police denied her access to one.

To further support her claim, the defendant asserts that the "small confines" of the interview room "contributed to her anxiety." However, the room was not inordinately small — it was eight by ten feet and contained a table and three chairs. Thus, the size of the interview room does not support her claim.

The defendant also argues that the detectives' repetition of questions weighs in favor of her involuntariness claim. Goodridge repeated many of his questions when Maher joined him in the middle of the interview because Maher needed to be apprised of what had happened up to that point. The questions were then repeated during the videotaped portion of the interview because the detectives were instructed to obtain a taped statement. The detectives, therefore, were merely repeating questions to inform others of the defendant's answers. The type of repetition here was not coercive; it involved no badgering or intimidation. Thus, this fact does not support the defendant's position.

■ Finally, the defendant directs us to the length of the interview — six and one-half hours. We have never directly assessed the voluntariness of an interview of this length. *See, e.g., Hernandez,* 162 N.H. at 706 (holding that an interview lasting two hours was not an inordinate or oppressive length); *State v. Bilodeau,* 159 N.H. 759, 764 (2010) (holding that an interview lasting fifteen minutes was not an inordinate or oppressive length); *Chapman,* 135 N.H. at 401 (holding that an interview lasting two and one-half hours was not an inordinate or oppressive length). In *Chapman,* we relied upon a case in which a federal court held that a seven and one-half hour interrogation of a person with an IQ of 89 did not render a confession involuntary. *See Sumpter v. Nix,* 863 F.2d 563, 565 (8th Cir. 1988). Also, other courts have permitted longer interviews. *See, e.g., United States v. Redditt,* 87 Fed. Appx. 440, 444 (6th Cir. 2003) ("[T]here is nothing necessarily coercive about a nine hour interrogation, and nothing necessarily coercive about an interrogation that lasts into the night."); *State v. Ackward,* 128 P.3d 382, 387-92 (Kan. 2006) (affirming trial court's finding that statements made during an eight and one-half hour interview were voluntary).

■ To be sure, six and one-half hours is a lengthy period of time to be faced with the stress and pressure inherent in police questioning. Nevertheless, an interview of this length, in and of itself, does not render a statement involuntary, for although the length of an interview is a relevant factor in determining voluntariness, what is of paramount importance is what occurred during the interview. After reviewing the record and considering all of the circumstances raised by the defendant, we cannot say that under the totality of the circumstances the defendant's statements were involuntary. The defendant was not in custody, the detectives did not take advantage of her distressed emotional state, the detectives did not deny her food or access to a telephone, the detectives offered her beverages, the detectives accurately informed the defendant of her daughter's medical condition, and the defendant confirmed that she was at the interview voluntarily. Furthermore, at the beginning of the videotaped portion of the interview, Maher read and explained the meaning of the defendant's *Miranda* rights and the defendant signed a *Miranda* waiver. *See Bilodeau,* 159 N.H. at 764 ("While compliance with *Miranda* does not conclusively establish the voluntariness of a later confession, it is one factor that a trial court can consider."). We thus hold that the manifest weight of the evidence, viewed in the light most favorable to the State, supports the trial court's ruling that the defendant's statements were voluntary beyond a reasonable doubt.

■ Accordingly, the admission of the defendant's statements did not violate her due process rights under Part I, Article 15 of the New Hampshire Constitution. Further, under these circumstances, the Federal Constitution offers the defendant no greater protection than does the State Constitution. *Compare State v. Ford*, 144 N.H. 57, 60 (1999) (holding that under the New Hampshire Constitution the State must "prove the voluntariness of [a] defendant's statements beyond a reasonable doubt"), *with Lego v. Twomey*, 404 U.S. 477, 487-89 (1972) (holding that under the Federal Constitution the State must prove the voluntariness of a defendant's statements by a preponderance of the evidence). We therefore reach the same result under the Federal Constitution as we do under the State Constitution.

## III

The defendant next argues that the court erred in two evidentiary rulings at trial: first, in admitting her statement to the detectives that in 2005 she struck Rylea and, second, in admitting evidence of her anger management problem. We agree.

## A

The trial court admitted the defendant's out-of-court statement about the incident that occurred several months prior to Rylea's injuries in which the defendant struck Rylea after Rylea had bitten her. An out-of-court statement offered to show the truth of the matter asserted is defined as hearsay and is generally inadmissible, absent a well-delineated exception. *State v. Soldi*, 145 N.H. 571, 575 (2000). The court ruled that the defendant's statement was not hearsay because it fell within New Hampshire Rule of Evidence 801(d)(2)(A). That rule, entitled *"Admission by party-opponent,"* provides the following:

> A statement is not hearsay if . . . [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity . . . .

N.H. R. Ev. 801(d)(2)(A).

The defendant argues that to come within this exclusion from the definition of hearsay the "admissions" must give rise to "a reasonable inference of guilt on the charged crime." According to the defendant, the trial court erred in admitting the defendant's statement because it did not raise a "reasonable inference of guilt." The State agrees with the defendant's interpretation of the rule, but argues that the defendant's statement did raise an inference of guilt, and was therefore properly admitted under Rule 801(d)(2)(A).

When we interpret a rule of evidence, our primary guidepost for its meaning is the language of the rule itself. *See Kenison v. Dubois*, 152 N.H. 448, 451 (2005). Rule 801 defines the term "statement" as any "oral or written assertion." N.H. R. Ev. 801(a). The specific section of Rule 801 at issue excludes from hearsay a "statement" offered against a party if it is "the party's own statement." N.H. R. Ev. 801(d)(2)(A). Thus, although the drafters of the rules captioned the exclusion "[a]dmission by party-opponent," the use of the word "admission" is not meant to narrow the rule to capture only statements relating to the party's guilt or to the concession of a fact in contention. Rather, by the plain language of the rule, it is meant to broadly capture any oral or written assertion made by a party-opponent. Accordingly, under New Hampshire Rule of Evidence 801(d)(2)(A), a party's own statements are not hearsay when offered against that party regardless of whether or not those statements give rise to a reasonable inference of guilt.

We have never squarely addressed this issue; however, we acknowledge that language in some of our prior cases supports the parties' interpretation of the rule. *See, e.g., State v. Lesnick*, 141 N.H. 121, 129 (1996) ("We agree with the State that the defendant's threatening statements fall within the general rule that a defendant's extrajudicial statement giving rise to a reasonable inference of guilt constitutes an admission. Though introduced for their truth, these out-of-court statements were not hearsay under [Rule 801(d)(2)(A)]." (brackets and quotation omitted)).

Nevertheless, the vast majority of other courts that have addressed this rule agree with the above interpretation. *See, e.g., United States v. Townsend*, 206 Fed. Appx. 444, 450 (6th Cir. 2006) ("Notwithstanding the appearance of the word 'admission' in the heading of [Federal Rule of Evidence] 801(d)(2), there is no requirement that a party's out-of-court statement be a confession or statement against interest to be admissible against the party in trial."); *United States v. McDaniel*, 398 F.3d 540, 545 n.2 (6th Cir. 2005) ("[T]he admissibility of a statement under [Federal Rule of Evidence] 801(d)(2) does not hinge . . . on whether or not the statement is against the party-declarant's interest."); *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980) (recognizing that under Federal Rule of Evidence 801(d)(2) a party's own statements are "admissible as non-hearsay admissions regardless of whether such statements were against [the party's] interest when made"); *State v. Bernier*, 597 A.2d 789, 791 (Vt. 1991) (rejecting defendant's argument that "only incriminating statements constitute admissions" and holding that "[a]dmissions include any statement made by and offered against a party opponent").

■ Accordingly, with this interpretation in hand, we hold that the trial court correctly concluded that the statement at issue is not hearsay. The statement was the defendant's own. It was an oral assertion. And, it was offered against her by the State. It thus clearly fell within the parameters of Rule 801(d)(2)(A).

■ This does not, however, end our inquiry. An out of court statement is not admissible merely because it is not hearsay under Rule 801(d)(2)(A) — it must also pass muster under the other rules of evidence. *See, e.g., United States v. Mason*, 294 Fed. Appx. 193, 198 (6th Cir. 2008) ("Hearsay and relevance are separate hurdles that the party attempting to introduce the evidence must overcome."); *United States v. Oberle*, 136 F.3d 1414, 1418 (10th Cir. 1998) ("Although the statements are party admissions under Rule 801(d) and thus not hearsay, they must nevertheless also be analyzed for admissibility under Rule 404(b) because they reveal or suggest prior criminal conduct."); *McAlinney v. Marion Merrel Dow, Inc.*, 992 F.2d 839, 843 (8th Cir. 1993) ("Although Federal Rule of Evidence 801(d)(2) provides that [party-opponent] admissions are not hearsay, Rule 403 still permits the district court to exclude such evidence . . . .").

■ The other rule at issue here is New Hampshire Rule of Evidence 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

To ensure that this rule is followed, we have held that before a trial court admits "other crimes, wrongs, or acts" evidence pursuant to Rule 404(b), it generally must first determine: (1) that the evidence is relevant for a purpose other than character or disposition; (2) that there is clear proof that the defendant committed the prior act; and (3) that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant. *See, e.g., State v. Nightingale*, 160 N.H. 569, 574 (2010); *State v. Addison*, 160 N.H. 493, 501 (2010); *see also State v. McGlew*, 139 N.H. 505, 507-10 (1995).

The statement at issue is undeniably evidence of "other wrongs . . . or acts" — the defendant unequivocally admitted to striking Rylea in an incident that occurred several months prior to Rylea's death. The defendant objected to the introduction of "any testimony or evidence" regarding this incident and, in support of her objection, referenced Rule 404(b) and

the aforementioned prongs. The trial court, therefore, should have analyzed the evidence under Rule 404(b). It did not, and thus we are obligated to do so now.

We do not address the first or second prongs of the analysis. Rather, we conclude, under prong three, that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice to the defendant; therefore, the statement should not have been admitted.

"Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case." *State v. Russell*, 159 N.H. 475, 485 (2009). Unfair prejudice is inherent in evidence of other similar crimes or wrongs because, notwithstanding the permissible reasons for which such evidence might be admitted, there is a risk that the jury will find the defendant had a propensity to commit the charged crime merely because the defendant committed a similar crime or wrong in the past. *See State v. Bassett*, 139 N.H. 493, 502 (1995). Such a risk runs counter to the principle that a defendant "may only be convicted if the jury finds that the accused committed the specific act that is the subject of the trial, and not some similar act at some other time." *State v. Blackey*, 137 N.H. 91, 94 (1993). The risk of unfair prejudice, moreover, increases as the degree of similarity between the prior act and the charged crime increases. *See State v. Watkins*, 148 N.H. 760, 768 (2002); *see also State v. Drew*, 137 N.H. 644, 649 (1993) ("[T]he degree of prejudice inherent in a reference to another charge may depend upon the similarity of the 'other incident' to that for which the defendant is currently on trial.").

Here, the prior wrong is very similar to the charged crime. The defendant's statement described an incident in which she physically struck her daughter; the State's theory at trial was that the defendant used violent force against her daughter. Thus, there was a high likelihood that the jury would conclude that the defendant struck her daughter in the charged incident merely because she had struck her daughter on a previous occasion. *See Watkins*, 148 N.H. at 768 ("Because of the similarity of the [prior] conviction . . . and the charged crimes, the jury may have been persuaded to find the defendant guilty, at least in part, because he had previously committed the same offense." (quotation omitted)). The danger of unfair prejudice was, accordingly, very high.

Moreover, the probative value of the evidence was minimal. The prior incident could not have been the cause of Rylea's death — it occurred

months prior to her injuries. It was also not necessary to impeach the defendant's statement that she had never physically punished Rylea because she admitted that she physically disciplined Rylea during the incident in question. Furthermore, given that several months had lapsed between the charged crime and the prior wrong, it had negligible, if any, probative value to her state of mind on the day in question. *See State v. Allen*, 128 N.H. 390, 397 (1986) ("Remoteness is one element to be considered in balancing probative value against the prejudicial effect of proffered evidence.").

Accordingly, the probative value of the defendant's statement was substantially outweighed by the danger of unfair prejudice. It thus should have been excluded pursuant to Rule 404(b). The defendant also argues that it was error for the court to allow the defendant's sister to testify about the prior incident. For the same reasons explained above, we agree.

B

The defendant's second evidentiary argument is that the trial court erred in admitting evidence that she has anger problems, that she underwent counseling for those problems, and that she believed she could benefit from such counseling. She argues that this evidence was "character evidence . . . not admissible for any proper purpose."

▮ Evidence of a defendant's anger may be admissible if it relates to the crime at hand. For example, it would be permissible for a trial court to admit evidence that the defendant was angry with the victim for the purpose of showing motive or state of mind. *See United States v. Lindsay*, 339 Fed. Appx. 268, 272 (3d Cir. 2009) (holding that it was not error for the trial court to admit evidence "that indicated [the defendant] had difficulty controlling his anger . . . toward [the victim]" because it went "directly to his motive to commit the two crimes charged" and the danger of unfair prejudice did not substantially outweigh the probative value of the evidence); *see also State v. Cassavaugh*, 161 N.H. 90, 98 (2010) (holding that a "threat . . . made during the course of a heated argument between [the victim] and the defendant" was admissible because it "went directly to whether the defendant intended to kill [the victim] when he shot her").

It is not, however, permissible for a trial court to admit evidence that merely shows a defendant is an "angry person" or has a general problem with anger. The State argues that the evidence in this case is admissible under Rule 404(b). Assuming, without deciding, that it constitutes evidence of "other crimes, wrongs, or acts," N.H. R. Ev. 404(b), we conclude that it fails under prong one of our Rule 404(b) test because the only end it could

possibly serve is to suggest that the defendant likely committed the charged crime because she acted in conformity with her angry temperament.

■ Here, the evidence about the defendant attending anger management classes had no specific connection to the crime charged. Accordingly, the only way in which the evidence was relevant was to impermissibly show that she had an anger problem generally and that she acted in conformity with that character trait on the day in question. *See People v. Knox*, 674 N.W.2d 366, 371 (Mich. 2004) (holding that evidence of defendant's anger towards the mother of the victim did not show that the defendant was angry with the victim and thus "could only serve the improper purpose of demonstrating that he had the bad character or propensity to harm [the victim]"). The evidence, therefore, should have been excluded pursuant to Rule 404(b).

## IV

The State argues that we should nonetheless affirm the defendant's conviction because the aforementioned errors were harmless. We agree.

■ An error is harmless only when it is determined, beyond a reasonable doubt, that the error did not affect the verdict. *State v. Pseudae*, 154 N.H. 196, 202 (2006). The State bears the burden of proving that an error is harmless. *Id.* An error may be harmless if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *Id.* In determining whether an error was harmless, we consider the alternative evidence presented at trial as well as the character of the inadmissible evidence. *Id.*

■ The defendant was convicted of manslaughter. RSA 630:2, I(b). To convict the defendant of manslaughter, the State had to prove beyond a reasonable doubt that she recklessly caused the death of another. *Id.* A person acts "recklessly" when "he is aware of and consciously disregards a substantial and unjustifiable risk," and the risk is "of such a nature and degree that, considering the circumstances known to him, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation." RSA 626:2, II(c) (2007).

Here, there was other, overwhelming evidence that the defendant recklessly caused Rylea's death. First, the State's experts provided extensive testimony that Rylea's injuries were non-accidental. One physician who examined Rylea's eyes found, among other things, multiple hemorrhages in the retina, detachment of the retina, and swelling in the optic nerves. Based upon his observations, he determined this was most likely caused by severe

shaking. A medical examiner who performed an autopsy on Rylea determined that her death was a result of traumatic head and neck injuries, which were likely caused by whiplash to her neck, neck compression and blunt force trauma to her head. In his opinion, her death was a homicide. A physician who examined MRI and CT scan images of Rylea testified that Rylea's neck injuries were caused by "either a direct blow or strangulation." A physician who treated Rylea in Boston testified that an interruption in blood flow in Rylea's carotid artery was caused by non-accidental trauma. A pediatrician who did not treat Rylea, but examined the relevant medical records, testified that in her opinion, Rylea's injuries "were the result of child abuse and abusive head trauma." The pediatrician also testified that "the findings in this case suggest that [Rylea] has had kind of a combination of forces on the head that include rapid rotational deceleration with blunt impact [along the neck]." Finally, although the defendant's own expert held no opinion as to whether Rylea's injuries were accidental or non-accidental, he did testify that Rylea's injuries were caused by trauma to her brain.

Doctors also testified as to the timing of Rylea's injury. The pediatrician testified that the injury occurred sometime between Wednesday night and before Rylea arrived at the babysitter's house on Friday. One of the physicians who treated Rylea testified that the incident that led to the brain swelling likely occurred within twenty-four hours of Rylea's collapse, but not immediately prior to her collapse. Another doctor testified that the injuries probably occurred twelve or more hours prior to the CT scan. This testimony strongly casts doubt on the possibility that the babysitter or her boyfriend caused Rylea's injuries, as Rylea was at the babysitter's house for only approximately one-half hour prior to her collapse. Furthermore, the defendant was Rylea's primary caretaker during the relevant timeframes.

The doctors' testimony, however, was not uniform. The defendant's expert testified that Rylea's injuries could have occurred within one hour of Rylea's initial CT scan. A physician who treated Rylea testified that the injury causing the bruise on her forehead probably occurred within one to two hours of her collapse. Nevertheless, the defendant's expert conceded that the injuries could have occurred during the preceding twenty-four hours and the treating physician testified that the injury causing the bruise on her forehead could have occurred up to twelve hours prior to Rylea's collapse. Accordingly, the jury heard ample testimony that convincingly demonstrated the defendant was most likely caring for Rylea when her injuries occurred.

In addition to this, the jury properly had before it statements of the defendant that correlate with the doctors' testimony about the cause and

timing of Rylea's injuries. The defendant said that on the day prior to Rylea's collapse she pushed Rylea towards the corner of a room where Rylea hit her head on a bookshelf. While the defendant did not expressly say that Rylea hit her head as result of the defendant's actions, she did not exclude this possibility, saying, "I don't know if it was me pushing her towards the corner or [Rylea] just being angry [that caused Rylea to hit her head]." The defendant also indicated she was generally using physical force during this incident, as she agreed with the detectives that she may have placed Rylea on the ground "a little too hard" and that she may have forcefully grabbed the back of her neck. These statements, coupled with the doctors' testimony, support the jury's conclusion that the defendant recklessly caused Rylea's injuries.

Further, the defendant admitted that on the day prior to Rylea's collapse she may have used "a little bit too much force" while changing Rylea's diaper. She said she "had to keep pushing her down on the floor" and "had to keep like turning her and getting her to lay back down . . . [be]cause she was trying real hard to get up." She also agreed that her hand "might have slipped up a little bit higher" than Rylea's collarbone area. These statements, again in conjunction with the doctors' testimony, support the conclusion that the defendant recklessly caused Rylea's death.

Aside from this, the defendant also made numerous statements suggesting she was culpable for Rylea's injuries. After Rylea hit her head on the bookshelf, the defendant said she "felt like a monster." When asked if she knew she had done something wrong after this incident, the defendant said, "It took a minute for it to hit me and I was like, I'm sorry." The defendant expressed concern that the police were going to take Rylea away as a result of her actions. Also, near the end of the interview, she said, "I managed to remember and now I'm in, gonna be in so much trouble for it." Furthermore, according to the detectives, the defendant initially denied that she had ever physically punished Rylea and, when faced with the prospect that someone else would say otherwise, she recanted and admitted that she had physically punished Rylea on the day prior to her collapse, suggesting that she may not have been entirely truthful in describing the above incidents.

In sum, the jury had before it overwhelming evidence of the defendant's guilt. The defendant's description of the incidents in which she used physical force against her daughter closely correspond with the doctors' testimony. The defendant's testimony, together with the doctors' testimony, strongly supports the conclusion that the defendant was caring for her daughter when Rylea's injuries occurred. The defendant made several statements suggesting she had had used too much physical force against her daughter and that she did something wrong. Also, the

defendant's general description of the events paints a picture of a person using unwarranted and dangerous physical force against a very young child. Accordingly, we conclude that the evidentiary errors at trial were harmless beyond a reasonable doubt.

*Affirmed.*

DALIANIS, C.J., and HICKS, CONBOY and LYNN, JJ., concurred.